103 Cal.Rptr.2d 222 (2001)
86 Cal.App.4th 222
Keith MELTON, Plaintiff and Respondent,
v.
INDUSTRIAL INDEMNITY COMPANY, Defendant and Appellant.
No. F018487.
Court of Appeal, Fifth District.
January 16, 2001.
As Modified January 17, 2001.
As Modified January 18, 2001.
Review Denied May 2, 2001.[**]
*226 McCormick, Barstow, Sheppard, Wayte & Carruth and James P. Wagoner, Fresno, for Defendant and Appellant.
Georgeson and Belardinelli and Richard A. Belardinelli, Fresno, for Plaintiff and Respondent.
Certified for Partial Publication.[*]

OPINION
BUCKLEY, J.

I. INTRODUCTION
Industrial Indemnity Company (Industrial) appeals from a judgment holding it liable for insurance bad faith on the ground it mishandled a "courtesy defense" and refused to indemnify its insured, Keith Melton. In the underlying action, Melton was found by the Workers' Compensation Appeals Board (WCAB or the Board) to *227 have fired an injured employee, Edward Martin, in violation of Labor Code[1] section 132a (section 132a or simply 132a) because Martin expressed an intention to file a workers' compensation claim.
The duty of good faith and fair dealing assertedly arose under any one of several theories advanced by Melton. He maintained his liability was covered, or was at least potentially covered, under his workers' compensation and employers' liability policy with Industrial. Alternatively, he argued Industrial had waived its coverage defenses, or was estopped to assert them, because it provided the defense without a reservation of rights. Finally, Melton contended the duty of good faith and fair dealing attached irrespective of the policy's application once Industrial undertook to provide a defense. The trial court ruled there was no coverage, no potential for coverage, and no estoppel to deny coverage, but it permitted the case to go to the jury on the theories of implied waiver and a duty undertaken. The jury returned a verdict for Melton and awarded him compensatory and punitive damages totalling $650,000.
In the published portion of this decision, we will conclude Melton's liability was covered under the workers' compensation portion of his policy notwithstanding the fact the firing was an intentional act. We will hold in particular that, given the nature of the workers' compensation system in California, neither the language in the policy limiting coverage to "accidents," nor the general public policy against furnishing insurance for willful acts, relieved Industrial of its responsibility to defend and indemnify Melton. We will hold further that Industrial was estopped to deny coverage on the ground Melton fired Martin after the policy expired.
In the unpublished portion of the decision, we will conclude the evidence fails to support the jury's award of compensatory damages with respect to certain of the economic losses Melton claimed to have suffered as a result of Industrial's bad faith. We will reject Industrial's objection to the jury's punitive damages award, as well as its numerous other contentions challenging the judgment on several additional grounds. Accordingly, we will affirm the judgment of liability but vacate the award of compensatory damages and remand the matter for a new trial on that issue alone unless Melton consents to a reduction of the award.

II. FACTS AND PROCEEDINGS

A. Overview
This case began in April of 1984 when Edward Martin fell off a ladder while working for Sierra Signs, a small sign company in Visalia owned by Keith Melton.[2] A few months later Martin suffered disabling back pains that he attributed to the fall, and that caused him to miss several weeks of work. By the time Martin was able to return to his job, Melton had replaced him with someone else.
Martin subsequently filed an injury claim with Industrial, Melton's workers' compensation carrier. Melton disputed the claim, arguing Martin's fall was not the cause of his back problems, and Industrial denied the claim for this reason. Martin then filed an "Application for Adjudication of Claim" with the WCAB. After a brief investigation, Industrial offered to settle Martin's claim for $4,200. With this offer still pending, the matter was set for a hearing on August 27, 1985.
On August 14, nearly a year after he was discharged and two weeks before the hearing on the "normal issues" (issues involving injury and disability), Martin filed a petition with the WCAB alleging Melton had fired him in violation of section 132a for having made known his intention to file *228 a workers' compensation claim. Discrimination of this sort, if proved, entitles a worker to recover additional compensation equal to one-half his or her injury award, as well as to job reinstatement and lost wages. In response to the petition, Melton denied any discriminatory intent, instead asserting he had replaced Martin because he was an undependable worker.
Industrial's position with regard to 132a petitions, as set out in its internal claims manual, was that an employer's liability for discriminatory acts was not covered by the standard workers' compensation policy. Nonetheless, the company customarily provided the employer with a "courtesy defense" in 132a cases in conjunction with its defense of the normal issues. Usually the two matters were resolved together; Industrial would agree to pay a little more than it otherwise might to settle the normal issues, in exchange for the employee's agreement to dismiss the petition.
In advance of providing a courtesy defense, Industrial's internal manual directed its claims department to send the employer a standardized "132a letter" setting out the company's no-coverage position but offering "as a service to you" to pay for an attorney selected by the employer (usually from a list of two or three attorneys suggested in the letter). In this instance however, Industrial neglected to send the 132a letter. Whether or not Melton was made aware of Industrial's position in some other way, and when, would become the primary factual issues in this case.
Up to this time, Melton and Industrial had been jointly represented on the normal issues by Industrial's Fresno staff counsel, Timothy Lickness. But Lickness was unable to attend the August 27 hearing and so referred the defense to Richard Yrulegui, an attorney with the firm of Emerson, Yrulegui and Igoa, who often handled workers' compensation cases for Industrial.[3] Soon after he received Melton's file, Yrulegui got a phone call from Mark Deutinger, Martin's attorney, accepting Industrial's outstanding $4,200 settlement offer. Accordingly, the matter was taken off calendar and, after some further negotiations, the normal issues were settled by way of a compromise and release approved by the workers' compensation judge (WCJ).
In a departure from Industrial's usual practice, the 132a was not resolved with the normal issues. Nor did Lickness or Yrulegui consult with Melton about the compromise and release, or discuss its future effect on his 132a liability (and possibly on his insurance premiums). Moreover, the settlement left unresolved the question of whether Martin had suffered, in workers' compensation parlance, an injury "arising out of and in the course of the employment" (AOE/COE). (See § 3600.) For all these reasons and more, the manner in which the normal issues were handled would become important later on in the controversy over the 132a.
Two disputed telephone conversations during this same period, both allegedly made to Melton on August 26, 1985, underlie Industrial's claim he was aware from the outset of the case that any 132a liability he might incur would not be covered under his policy. One of the calls came from Valerie Souza, the Industrial claims representative assigned to Melton's file at the time, and the other came from Richard Yrulegui. Both Souza and Yrulegui testified they explained to Melton, and he seemed to understand, that he would be personally responsible for any 132a award. Melton, on the other hand, asserted he was not told anything of the sort until more than two and a half years later.
Although Yrulegui was aware of the discrimination claim at this point, Industrial had retained him for the normal issues only. During these same two disputed telephone conversations, Melton reportedly agreed to hire Yrulegui for the 132a as well. Yrulegui asked Souza for written confirmation. But Souza was transferred *229 to a different caseload the same day and never followed up on the request. Nor did her replacement, who closed the Melton file in October once settlement of the normal issues was complete. Yrulegui also closed his file. As a result, several months went by during which no one represented Melton on the 132a. He assumed, by his account, that it had been resolved along with the injury claim.
Industrial's oversight became apparent in January of 1986 when Martin's attorney, Deutinger, contacted Yrulegui and Industrial to arrange for Melton's deposition. With Melton's approval, or at least with his acquiescence, Yrulegui was then hired to defend the 132a claim. Just who Yrulegui was representingMelton or Industrial, or bothwas a matter of considerable confusion during the remainder of the proceedings. There were several reasons for this uncertainty: Industrial was named as a defendant in most of the pleadings; Yrulegui often identified himself as Industrial's representative in pleadings and correspondence, and before the WCAB; he regularly shared information about the case with Industrial, sometimes to the exclusion of Melton; and without consulting Melton, Yrulegui made settlement offers to Martin on Industrial's behalf.
The situation grew even murkier late in 1986. In November, Yrulegui attended a workers' compensation seminar where he learned for the first time of a legal argument in favor of coverage for an employer's 132a liability. On this basis, Yrulegui recommended to Industrial that it pay for Cumis counsel (San Diego Federal Credit Union v. Cumis Ins. Society, Inc. (1984) 162 Cal.App.3d 358, 208 Cal.Rptr. 494) to represent Melton on the coverage issue. Industrial agreed. Yrulegui then met with Melton, explained there was a "potential coverage dispute," and gave him the names of two attorneys (both of whom ordinarily represented applicants rather than employers). Melton selected John Mitchell. He was now represented by Yrulegui with regard to his 132a liability, and by Mitchell on the matter of coverage should he be found liable. Significantly, although coverage had once again become an issue, Industrial still did not send Melton a 132a letter.
Yrulegui also suggested to Industrial that it attempt to settle the 132a in lieu of paying the additional cost of a Cumis attorney. Industrial agreed and authorized Yrulegui to offer up to $6,000. Yrulegui made the offer in early December but Martin rejected it, first demanding $8,000 and then $13,000. Yrulegui did not tell Melton at the time about these negotiations, nor did he suggest to Melton that he contribute some of his own money toward the settlement.
Yrulegui did, however, have such a conversation with Melton some three months later on March 6, 1987, the date of the 132a hearing. The parties' positions remained the same: Martin wanted $13,000 to settle the case but Industrial was willing to pay no more than $6,000. Melton declined to come up with the difference because, he testified later, he believed Industrial would pay any award. Sometime later that same day Martin raised his demand to $23,000. Since he was working only sporadically, the value of Martin's claim was increasing with time as his lost wages at Sierra Signs continued to accrue.
The 132a hearing was concerned only with Melton's liability, i.e., whether Martin had suffered a work-related injury and whether Melton had fired him for pursuing a workers' compensation claim. Although the issue of insurance coverage could have been litigated as well, none of the parties chose to raise it. Consequently, given the subject of the hearing, it was Yrulegui rather than Mitchell who prepared and presented Melton's defense. But, for what he described as tactical reasons, Yrulegui stated his appearance at the hearing on behalf of Industrial.
Like Melton, Mitchell testified it was his impression during this period that Industrial *230 would pay any 132a award. This was so, he believed, because Industrial had not taken a formal coverage position (in the form of a 132a letter), because Industrial had made settlement offers to Martin, and because Yrulegui had said several times he thought Industrial would pay. Mitchell, in turn, conveyed his impression to Melton. Yrulegui, on the other hand, denied telling Mitchell Industrial would or might pay the entire award, only that it might contribute some money toward it. From the time he was hired, Mitchell had little direct contact with Industrial but relied instead on Yrulegui to communicate with the company.
Soon after the 132a hearing, Mitchell wrote to Yrulegui asking that Industrial renew its previous settlement offer. Yrulegui relayed the request to an Industrial claims representative who told him not to renew the offer lest it provide "more argument Mitchell will use to make us pay if [we] lose." Yrulegui evidently complied with these instructions, but he would later tell Mitchell he was continuing to discuss a settlement with Deutinger.
The WCJ's decision in June of 1987 found no 132a violation and ordered Martin's petition dismissed. But the decision was based on a narrow interpretation of the statute later rejected by the WCAB. The Board granted Martin's petition for reconsideration on this ground and remanded the case. The reconsidered decision in December favored Martin. The WCJ found that Martin had suffered an injury AOE/COE, and that Melton had discharged him for making known his intention to file an injury claim. Melton (but not Industrial) was ordered to pay Martin $2,100, i.e., one-half the compensation already paid him on the normal issues, plus an amount yet to be determined for Martin's back wages, less any amounts he had earned since his discharge. In addition, Melton was directed to reinstate Martin to his former job as a sign repairman.
Melton did in fact reinstate Martin in January of 1988. But the question of who would pay the monetary portion of the award, Melton or Industrial, remained in question. Mitchell wrote to Yrulegui in February to say that Melton was willing to contribute to a settlement but was facing bankruptcy. In March, the WCAB denied Melton's petition for reconsideration of the second 132a decision. A few days later, Mitchell made a formal demand on Industrial for payment of the award. The demand went to Dennis Rossi, the claims supervisor overseeing Melton's file.
On April 5, 1988, after referring the matter to the home office for review, Rossi responded by sending Melton the equivalent of a 132a letter. Rossi stated Melton's 132a liability was not covered under his policy because the policy applied only to events resulting in bodily injury, and because insurance companies are prohibited by law from insuring losses caused by willful conduct. This letter, according to Melton, was the first time Industrial told him he would be personally responsible for the 132a award. It was, without dispute, the first time Industrial told him so in writing.
A supplemental hearing followed in December to determine Martin's lost wages. The decision in March of 1989 initially indicated the 132a award was against Industrial, but it was amended a few days later to identify Sierra Signs as the responsible party. It is not clear how or why this change was made, and specifically whether Yrulegui had some hand in it, but the possibility Yrulegui had intervened with the WCAB on Industrial's behalf would later be cited by Melton in an effort to show a conflict of interest. Based on the amended hearing decision, Melton eventually borrowed money on his house and paid Martin a total of $42,772.42.
In the meantime, notwithstanding Industrial's 132a letter, Mitchell continued to try to convince Industrial to provide coverage or at least to pay a part of the 132a award in lieu of defense costs. Industrial refused. Faced with the prospect of having to pay the entire award, Melton contacted *231 Attorney Richard Belardinelli to discuss a possible legal action against Industrial for insurance bad faith.
In February of 1989, Belardinelli sent Industrial a detailed 74-page letter, with exhibits, challenging Industrial's denial of coverage as set out in Rossi's April 5, 1988, letter. Belardinelli argued Industrial's policy afforded coverage for 132a violations, or at least could be interpreted reasonably to do so. Alternatively, he maintained Industrial had waived its coverage defenses, or was estopped to assert them, because it had led Melton to believe to his detriment that it would pay the 132a award. Finally, Belardinelli also claimed Industrial was liable for the award because it had been a named defendant in the 132a action. Notably, Belardinelli did not rely on the argument that had given rise two years earlier to the "potential coverage dispute."
Industrial referred Belardinelli's letter to Andre Hassid, an attorney in its home office. Hassid wrote back to Belardinelli the next month disputing each of his arguments and once again denying coverage. Hassid's response, which represented Industrial's final coverage position, would itself become controversial as Melton later alleged it was based in part on confidential information provided to Hassid by Yrulegui.
On May 19, 1989, Melton initiated the present proceedings by filing a complaint against Industrial and Yrulegui in which he asserted 12 causes of action: breach of contract (against Industrial only), breach of the covenant of good faith and fair dealing (against Industrial only), "waiver/estoppel," "fraud/deceit," negligent misrepresentation, violations of California law, negligence, intentional and negligent infliction of emotional distress, constructive fraud, breach of fiduciary duty, and violations of the Insurance Code.
Melton alleged generally that Industrial was obligated to defend and indemnify him with respect to the 132a either because his insurance policy afforded coverage or because the doctrines of waiver and estoppel operated to negate the policy's coverage defenses. On this premise, he alleged Industrial breached its contractual obligations, as well as the implied covenant of good faith and fair dealing, by mishandling his defense and refusing to pay the discrimination award. In addition, he alleged that Yrulegui, and Industrial to the extent Yrulegui was acting on its behalf, breached various other duties owed to him by failing to represent him properly. Melton claimed he suffered physical injury, emotional distress, and financial losses as a result of these acts and omissions.
A 60-day trial began on September 24, 1991, and was initially taken up with numerous in limine and other motions seeking generally to define and limit the issues before the court and jury. The court's rulings on these motions will be discussed below as they relate to the specific issues raised on appeal. But some of them bear mentioning here because they help to put the eventual outcome into some better perspective.
Among other things, Industrial moved to have the court decide two questions of law: whether Melton was collaterally estopped to relitigate the WCAB's factual findings with respect to his 132a liability, and whether Industrial's workers' compensation policy afforded coverage for such liability. Industrial also asked the court to decide two other issues it characterized as equitable: whether Industrial should be estopped to assert its coverage defenses under the policy, and whether Industrial had impliedly waived these defenses.
In connection with the first issue, collateral estoppel, the court took judicial notice of the entire WCAB file in the Martin case, but it denied the bulk of Industrial's request to take judicial notice of various facts purportedly established by the record. However, it did take notice of the WCJ's two express findings in the 132a action, namely that Martin had suffered an injury arising out of and in the course of *232 his employment by Sierra Signs, and that Melton had discriminated against Martin by discharging him for having made known his intention to file a claim based on the injury. The court ruled Melton was collaterally estopped to contest these two findings. Accordingly, it instructed the jury at the outset of the trial to accept them as true for all purposes.
The practical effect of this ruling was that Melton was precluded from arguing he had been provided with an inadequate defense insofar as Industrial and Yrulegui failed to fully investigate the facts behind Martin's injury and discrimination claims. The court granted Industrial's in limine motions to this effect. It was Melton's position that a proper investigation would have shown, just as he had claimed all along, that Martin was actually injured in a fight or motorcycle accident, and that he was an undependable worker who was replaced when he failed to return to work as promised. Alternatively, if a more thorough investigation had disproved these claims (and if he had been made aware he would be personally liable for a 132a award), Melton sought to argue he had lost the opportunity to settle the 132a at an early stage of the proceedings when the amount of Martin's accrued back wages still was relatively small.
Melton was eventually given the opportunity to make these arguments much later in the trial when the court, on its own motion, reconsidered and modified its collateral estoppel decision. The court ruled Melton was still precluded from relitigating his 132a liability but he could attempt to show he would have prevailed on the 132a had he been provided with a more effective defense. In keeping with its revised ruling, the court instructed the jury it must accept as true only that Martin had been "adjudged" by the WCAB to have suffered an industrial injury and to have been fired by Melton as a consequence. The court also reversed its prior rulings on Industrial's in limine motions relating to the investigation of Martin's claims.
The second significant question addressed by the court was whether Industrial's workers' compensation policy provided coverage for an employer's 132a liability. The court initially concluded the issue had a factual component and deferred a decision until the evidentiary phase of the trial. The court was concerned particularly with whether Melton could have violated section 132a negligently or accidentally. This question was effectively resolved once the court took judicial notice of the WCAB's finding that Melton discharged Martin because Martin had made known his intention to file a workers' compensation claim. For this reason, the court revisited the coverage issue in connection with Industrial's motion for judgment on the pleadings, and concluded there was no coverage. It relied primarily on a provision in the policy limiting its application to injuries "(1) by accident occurring during the policy period, or (2) by disease...." (Italics added.) It relied to a lesser degree on a statutorily-declared public policy against insuring losses caused by willful acts, and noted too that Martin was discharged after the policy expired. The court later instructed the jury that Industrial's policy did not cover Melton's 132a liability for the first two of these three reasons.
Finally the court addressed the questions of estoppel and implied waiver. Given their factual nature, it deferred a decision on both issues until all the evidence had been presented. Then at the conclusion of the trial, the court ruled Industrial was not estopped to assert its coverage defenses because, notwithstanding the lack of a 132a letter, Melton was aware of Industrial's coverage position and did not detrimentally rely on a belief Industrial would pay the 132a award. More importantly for purposes of this appeal, the court concluded these two estoppel findings did not necessarily resolve the related but distinct issue of waiver, a legal rather *233 than an equitable question the court therefore allowed to go to the jury. The court likewise concluded its estoppel findings did not necessarily dispose of several other causes of action that presumed Melton had been misled as to Industrial's coverage position.
Nine of the original twelve causes of action survived. As instructed by the court, the jury was allowed to find a breach of contract on the premise Industrial had impliedly waived its coverage defenses (the "contract by waiver" theory). It could find a breach of the covenant of good faith and fair dealing premised either on the contract by waiver theory or on the theory that Industrial, once it undertook to defend Melton, had a duty to do so fairly and in good faith irrespective of the application of the insurance policy. The court denied Industrial's motion for nonsuit with respect to Melton's causes of action for "fraud/deceit," negligent misrepresentation, negligence, negligent infliction of emotional distress, constructive fraud, and breach of fiduciary duty. The court granted the motion with respect to intentional infliction of emotional distress. The two causes of action for violations of California law had been dismissed earlier in the trial.
The jury deliberated for approximately ten hours over three days. On January 7, 1992, by a vote of nine to three, it returned a general verdict against both Industrial and Yrulegui, and awarded Melton compensatory damages in the amount of $630,000. In response to special interrogatories, the jury indicated $380,000 of this amount was for Melton's attorney fees, recoverable as damages on account of Industrial's breach of the covenant of good faith and fair dealing. Also in response to the special interrogatories, the jury found that Industrial's (but not Yrulegui's) conduct giving rise to its liability was committed with malice, fraud, or oppression. The jury then awarded Melton an additional $20,000 in punitive damages as against Industrial only. Thus, Yrulegui's liability for the award extended only to the $250,000 in compensatory damages, exclusive of the allocation for Melton's attorney fees.
Before judgment was entered on the verdict, Yrulegui reached a settlement with Melton and moved the court for a determination of good faith. The count granted the motion over Industrial's vigorous opposition and, after further hearing, set the value of the settlement at $130,000 as an offset against Industrial's liability. The verdict against Yrulegui was then set aside. On June 24, 1992, judgment was entered in favor of Melton and against Industrial for $520,000 plus costs. Industrial's motions for judgment notwithstanding the verdict and new trial were denied, whereupon it filed a timely notice of appeal.

B.-S[***]

III. DISCUSSION
Industrial challenges the judgment on numerous grounds.[30] Its principal contention is that it did not breach its insurance contract with Melton because there was no coverage under the policy for an employer's 132a liability, and because implied waiver, if it applied at all, could not have created coverage where none existed before. Without a contractual duty to defend or indemnify Melton, Industrial continues, it could not have *234 breached the implied covenant of good faith and fair dealing. And on that premise, Industrial contests the jury's award of attorney fees as damages in the bad faith action.
As for each of Melton's other causes of action, Industrial maintains the court's estoppel findings effectively negated one or more of the elements necessary to establish liability.
Finally, Industrial contends the trial court gave the jury an incomplete and erroneous special verdict form; the court committed many other evidentiary and instructional errors requiring reversal; and the evidence fails to support some elements of the jury's damages award.

A. Breach of ContractCoverage
The trial court concluded Industrial's policy did not cover Melton's 132a liability because the policy, by its terms, applied only to "injury ... by accident occurring during the policy period" (italics added), and because the public policy expressed in sections 533 of the Insurance Code and 1668 of the Civil Code precludes coverage for an insured's willful acts. This conclusion, of course, was based on the premise Melton's discharge of Martin was a willful act, an issue Melton has not conceded.
Although Industrial prevailed on the coverage question at trial, it has raised it again on appeal, arguing there is no coverage for the same reasons cited by the court, as well as for two additional ones. In the course of our review of this question, we asked the parties to submit supplemental briefing regarding the accident limitation. In its response, Industrial now contends the matter of coverage is not properly before us except indirectly insofar as it relates to the jury's implied finding of contract by waiver. That is, Industrial notes Melton has not cross-appealed from the judgment to challenge the court's adverse coverage ruling, nor does Melton contend the court's error, if any, in submitting the contract by waiver theory to the jury was harmless because coverage existed under the policy.
In a related argument, Industrial seems to contend, in effect, that we may not affirm the jury's verdict, but must remand for retrial, if we find coverage existed on any ground other than a "contract by waiver." This is so, it reasons, because the jury did not have the opportunity to consider any other grounds. We will briefly address these two contentions.
As a general rule, an appellate court will not review an error committed against a nonappealing party. (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 323, p. 361.) We may, however, at the respondent's request, review any of the trial court's intermediate rulings "for the purpose of determining whether or not the appellant was prejudiced by the error or errors upon which he relies for reversal or modification of the judgment from which the appeal is taken." (Code Civ.Proc., § 906; Erikson v. Weiner (1996) 48 Cal. App.4th 1663, 1671, 56 Cal.Rptr.2d 362.) Here, the trial court ruled there was no coverage for Melton's 132a liability but it permitted the case to go to the jury on a contract by waiver theory (as well as the theory Industrial assumed a duty of good faith and fair dealing irrespective of policy coverage once it undertook to provide Melton with a courtesy defense). Industrial challenges the jury's contract by waiver verdict on several grounds, including an argument that waiver cannot create coverage where none existed before. Thus, it is precisely to show prejudice that Industrial raises the coverage issue on appeal. And, although Melton does not phrase it in such terms, his counter-argument in favor of coverage, if successful, would show that the jury's reliance on the contract by waiver theory, if erroneous, was not prejudicial. Accordingly, we may review the trial court's coverage ruling.
Industrial's second contention is difficult to follow, but seems to be based on the premise the particular legal theory under *235 which coverage was found to exist was critical to the jury's finding of bad faith. That is, the argument appears to assume the jury, given the trial court's ruling of no coverage, found Industrial's preeminent act of bad faith was its ultimate refusal to acknowledge it had waived its coverage defenses. So Industrial contends in effect that, if coverage existed from the beginning, a new trial is required to determine whether Industrial's initial denial of coverage was reasonable, e.g., whether it was based on a genuine or debatable issue of law. This contention, if we understand it correctly, confuses the contract theory giving rise to a duty of good faith with the acts constituting a breach of the duty.
The jury's verdict was not based on Industrial's failure to extend coverage on any particular ground. In essence, the jury found Industrial had acted in bad faith by failing unreasonably to honor its obligations under the insurance policy to defend and indemnify Melton against Martin's 132a claim. The verdict supposed Industrial had a contractual obligation to Melton and looked to Industrial's acts and omissions in performance of that obligation, not to the specific contractual term or legal theory under which the obligation arose. Here the jury found that Industrial, although it could have, chose by implication not to assert its legitimate coverage defenses and, in effect, accepted coverage. If, on the other hand, the court had ruled there was coverage, the jury would not have needed to consider the contract by waiver theory, but its task would have been the same with regard to bad faith.
With this in mind, we turn to the matter of coverage. We begin with an overview of the workers' compensation system in California and the requirement that an employer insure itself against liability for workers' compensation benefits.

1. The Workers' Compensation System
The California workers' compensation law is a statutory scheme enacted by the Legislature pursuant to a constitutional grant of plenary power to create and enforce a "complete system of workers' compensation." (Cal. Const., art. XIV, § 4.) The right to workers' compensation benefits is wholly statutory and is not derived from common law. (DuBois v. Workers' Comp. Appeals Bd. (1993) 5 Cal.4th 382, 388, 20 Cal.Rptr.2d 523, 853 P.2d 978.)
The workers' compensation law is contained principally in division 4 of the Labor Code (§§ 3200-6002). Where the conditions of compensation exist, an employer is liable, regardless of fault, for the compensation provided under division 4 for "any injury" sustained by an employee arising out of and in the course of the employment. (§ 3600.) As we will explain, this liability extends to some intentionally-caused injuries, including those arising from a wrongful termination. With certain exceptions, the right to recover such compensation is the sole and exclusive remedy of the employee against the employer. (§ 3602.)
"[T]he legal theory supporting such exclusive remedy provisions is a presumed `compensation bargain,' pursuant to which the employer assumes liability for industrial personal injury or death without regard to fault in exchange for limitations on the amount of that liability. The employee is afforded relatively swift and certain payment of benefits to cure or relieve the effects of industrial injury without having to prove fault but, in exchange, gives up the wider range of damages potentially available in tort." Shoemaker v. Myers (1990) 52 Cal.3d 1, 16, 276 Cal.Rptr. 303, 801 P.2d 1054.)
The workers' compensation law must, among other things, make "full provision for adequate insurance coverage against liability to pay or furnish compensation; full provision for regulating such insurance coverage in all its aspects ...; [and] full provision for otherwise securing the payment of compensation...." (Cal. Const., art. XIV, § 4.) Accordingly, every employer except the state is required to *236 "secure the payment of compensation" either by purchasing insurance or by self-insuring against its statutory liability. (§ 3700.) Employers who comply with the insurance requirement are relieved of liability for compensation, which is assumed by the insurance carrier. Employers Mutual Liability Ins. Co. v. Tutor-Saliba Corp. (1998) 17 Cal.4th 632, 638, 71 Cal. Rptr.2d 851, 951 P.2d 420.) An employer who does not meet the requirement is subject to severe sanctions. Failure to comply is a misdemeanor (§ 3700.5) and exposes the employer to civil liability for the employee's injury (§ 3706). (See also §§ 3715, subd. (a); 4555; 5600.) The employer may be prohibited from using employee labor until it complies with section 3700. (§ 3710.1.) And, when an employer's failure to comply is willful, the amount of compensation otherwise recoverable is increased by 10 percent. (§ 4554.)
Workers' compensation insurance includes insurance against loss from liability imposed under the workers' compensation law. (Ins.Code, § 109.) Chapter 2 of part 3 of division 2 of the Insurance Code (Ins. Code, §§ 11630-11663) regulates the content of workers' compensation insurance policies. "`The terms of workers' compensation policies issued in California are strictly governed by statute, and each policy is conclusively presumed to contain all the provisions required by law.' [Citation.]" (La Jolla Beach & Tennis Club, Inc. v. Industrial Indemnity Co. (1994) 9 Cal.4th 27, 36, 36 Cal.Rptr.2d 100, 884 P.2d 1048.)

2. The Policy
For the period from August 1, 1983, to August 1, 1984, Melton was insured by Industrial under a "STANDARD WORKERS' COMPENSATION AND EMPLOYERS' LIABILITY POLICY," subject to an amendatory endorsement for California. Under the heading of "INSURING AGREEMENTS," Industrial agreed:
"I. COVERAGES
"Coverage AWorkers' Compensation "To pay promptly when due all compensation and other benefits required of the insured by the workers' compensation law.
"Coverage BEmployers' Liability
"To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury by accident or disease, including death at any time resulting therefrom,
"II. DEFENSE, SETTLEMENT, SUPPLEMENTARY PAYMENTS
"As respects the insurance afforded by the other terms of this policy, the company shall:
"(a) defend any proceeding against the insured seeking such benefits and any suit against the insured alleging such injury and seeking damages on account thereof, even if such proceeding or suit is groundless, false or fraudulent; but the company may make such investigation, negotiation and settlement of any claim or suit as it deems expedient;
".................................
"III. DEFINITIONS
"(a) Workers' Compensation Law. The unqualified term `workers' compensation law' means the workers' or workmen's compensation law and any occupational disease law of a state designated in Item 3 of the declarations [i.e., California], but does not include those provisions of any such law which provide nonoccupational disability benefits.
"...............................
"IV. APPLICATION OF POLICY
"This policy applies only to injury (1) by accident occurring during the policy period, or (2) by disease caused or aggravated by exposure of which the last day of the last exposure, in the employment *237 of the insured, to conditions causing the disease occurs during the policy period."
As discussed below, this last provision, part IV, was amended by the endorsement with respect to coverage A.
The next section of the policy, entitled "EXCLUSIONS," makes no reference directly or indirectly to an employer's liability under section 132a. By contrast, the endorsement expressly excludes coverage for the additional compensation imposed on an employer under section 4553 for injuries resulting from the employer's serious and willful misconduct.
The policy expressly incorporates all the provisions of the workers' compensation law with respect to coverage A, and provides that any policy term in conflict with the law is amended to conform to it.
We are concerned here only with Industrial's duty under coverage A "[t]o pay promptly when due all compensation and other benefits required of the insured by the workers' compensation law." By its exclusionary terms, coverage B does not apply "to any obligation for which the insured or any carrier as his insurer may be held liable under the workers' compensation or occupational disease law of [California]...." Employers' liability insurance (coverage B) written in conjunction with workers' compensation policies "is intended to serve as a `gap-filler,' providing protection to the employer in those situations where the employee has a right to bring a tort action despite the provisions of the workers' compensation statute or the employee is not subject to the workers' compensation law. [Citation.] Generally, these two kinds of coverage are mutually exclusive." (Producers Dairy Delivery Co. v. Sentry Ins. Co. (1986) 41 Cal.3d 903, 916, 226 Cal.Rptr. 558, 718 P.2d 920, fn. omitted.) Since Martin's 132a claim sought to impose liability under the workers' compensation law, Industrial's obligations to Melton, if any, arose under coverage A. (See La Jolla Beach & Tennis Club, Inc. v. Industrial Indemnity Co., supra, 9 Cal.4th at pp. 42-43, 36 Cal. Rptr.2d 100, 884 P.2d 1048 [insurer's duty to defend claim for workers' compensation benefits is owed under workers' compensation part of policy]; Transamerica Ins. Co. v. Superior Court (1994) 29 Cal.App.4th 1705, 1715, 35 Cal.Rptr.2d 259 [where workers' compensation liability exists, there is no coverage under the employer's liability portion of policy].)

3. Rules of Policy Interpretation
The interpretation of an insurance policy, as with any written contract, is primarily a judicial function. Unless the interpretation turns on the resolution of disputed factual issues, a reviewing court is not bound by the lower court's determination. Rather, we exercise our own independent judgment regarding the meaning of the policy language. (Cooper Companies v. Transcontinental Ins. Co. (1995) 31 Cal.App.4th 1094, 1100, 37 Cal.Rptr.2d 508; Merced Mutual Ins. Co. v. Mendez (1989) 213 Cal.App.3d 41, 45, 261 Cal.Rptr. 273.)
"While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply." (Bank of the West v. Superior Court (1992) 2 Cal.4th 1254, 1264, 10 Cal.Rptr.2d 538, 833 P.2d 545.)
"Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. (Civ. Code, § 1636.) Such intent is to be inferred, if possible, solely from the written provisions of the contract. (Id., § 1639.) The `clear and explicit' meaning of these provisions, interpreted in their `ordinary and popular sense,' unless `used by the parties in a technical sense or a special meaning is given to them by usage' (id., § 1644), controls judicial interpretation. (Id., § 1638.) Thus, if the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning. [Citations.]" (AIU Ins. Co. v. Superior *238 Court (1990) 51 Cal.3d 807, 821-822, 274 Cal.Rptr. 820, 799 P.2d 1253.)
"`An insurance policy provision is ambiguous when it is capable of two or more constructions both of which are reasonable.'" (Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co. (1993) 5 Cal.4th 854, 867, 21 Cal.Rptr.2d 691, 855 P.2d 1263.) An ambiguity is to be resolved by interpreting the ambiguous provision in the sense the promisor (i.e., the insurer) believed the promisee (i.e., the insured) understood it at the time it was made. (ALU Ins. Co. v. Superior Court, supra, 51 Cal.3d at p. 822, 274 Cal.Rptr. 820, 799 P.2d 1253; Civ.Code, § 1649.) "This rule, as applied to a promise of coverage in an insurance policy, protects not the subjective beliefs of the insurer but, rather, `the objectively reasonable expectations of the insured.'" (Bank of the West v. Superior Court, supra, 2 Cal.4th at p. 1265, 10 Cal.Rptr.2d 538, 833 P.2d 545.) Only if application of this rule fails to resolve the ambiguity is it then construed against the insurer. (Ibid., Civ.Code, § 1654.)[31]
"In summary, a court that is faced with an argument for coverage based on assertedly ambiguous policy language must first attempt to determine whether coverage is consistent with the insured's objectively reasonable expectations. In so doing, the court must interpret the language in context, with regard to its intended function in the policy. [Citation.] This is because 'language in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract' [Citations.]" (Bank of the West v. Superior Court, supra, 2 Cal.4th at p. 1265, 10 Cal.Rptr.2d 538, 833 P.2d 545.)
Industrial argues the policy did not cover Melton's 132a liability for four reasons: (1) a discriminatory discharge in violation of section 132a is not an "accident"; (2) the forms of relief afforded for a 132a violation do not constitute "compensation and other benefits" within the scope of coverage A; (3) the policy was not in effect when Melton discharged Martin; and (4) public policy precludes coverage for willful acts. The trial court concluded coverage did not exist for the first and fourth of these reasons.[32] We address them in a somewhat different order.
Before considering any exclusions or limitations, we must first examine a policy's coverage provisions to determine whether a claim falls within its terms. (Waller v. Truck Ins. Exchange, Inc., supra, 11 Cal.4th at p. 16, 44 Cal.Rptr.2d 370, 900 P.2d 619.) This is so for two reasons. First, where a claim clearly is not included within the insuring agreement, it need not be specifically excluded. Second, while limitations on coverage are narrowly construed and must be proved by the insurer, the burden is on the insured to bring the claim within the basic scope of coverage. (Ibid.)

*239 4. "Compensation and Other Benefits"
Coverage A requires Industrial "[t]o pay promptly when due all compensation and other benefits required of the insured by the workers' compensation law." The policy, by its terms, incorporates all provisions of the "workers' compensation law" with respect to coverage A, and further provides that any policy term in conflict with the law is amended to conform to it.
"Compensation" is statutorily defined as "compensation under Division 4 [of the Labor Code] and includes every benefit or payment conferred by Division 4 upon an injured employee, including vocational rehabilitation, or in the event of his death, upon his dependents, without regard to negligence." (§ 3207.) Referring to the section 3207 definition, Industrial maintains coverage A applies only to compensation and other benefits required of an insured by division 4 of the Labor Code. It argues the remedy afforded by section 132a does not fall within this coverage because section 132a is in division 1 of the code, and because the remedy is in the nature of a penalty rather than compensation.[33]
In determining the scope of coverage A, we look first to the language of the policy to ascertain if possible its plain meaning, or the meaning a layperson would ordinarily attach to it. (Waller v. Truck Ins. Exchange, Inc., supra, 11 Cal.4th at p. 18, 44 Cal.Rptr.2d 370, 900 P.2d 619.) Absent evidence the parties attached some special meaning to these words, we interpret them in their "`ordinary and popular sense.'" (AIU Ins. Co. v. Superior Court, supra, 51 Cal.3d at p. 822, 274 Cal.Rptr. 820, 799 P.2d 1253.)
In particular, we are concerned with the meaning of the phrase "all compensation and other benefits required of the insured by the workers' compensation law." Industrial would have us read it to mean "all compensation required of the insured by division 4 of the Labor Code." We believe the more reasonable interpretation is "all compensation and other benefits recoverable in a workers' compensation proceeding." (See La Jolla Beach & Tennis Club, Inc. v. Industrial Indemnity Co., supra, 9 Cal.4th at p. 42, 36 Cal. Rptr.2d 100, 884 P.2d 1048 [coverage under workers' compensation policy for "benefits required of you by the workers' compensation law" "is susceptible of no other objective construction than providing coverage solely for workers' compensation benefits, or claims, proceedings, or suits for such benefits, and not for civil suits for damages"].) Although section 132a does not provide the exclusive remedy for discrimination based on a work-related disability, the specific remedies it affords can only be recovered in a proceeding before the WCAB. (City of Moorpark v. Superior Court (1998) 18 Cal.4th 1143, 1155-1156, 77 Cal.Rptr.2d 445, 959 P.2d 752; § 5300.) It follows that section 132a is part of the general "workers' compensation law" and anything it provides in the nature of "compensation" or "other benefits" therefore falls within the ambit of coverage A.
*240 Industrial also contends a 132a award is really a penalty rather than a form of compensation. However, section 132a itself provides for increased "compensation." And a 132a award serves a remedial as well as a deterrent purpose. (Judson Steel Corp. v. Workers' Comp. Appeals Bd., supra, 22 Cal.3d at p. 668, 150 Cal. Rptr. 250, 586 P.2d 564 ["although one function of section 132a may be to deter employers from discriminating against industrially injured employees, the statute also serves a remedial function, by providing some compensation to the aggrieved worker for discrimination incurred as the result of his injury"]). Indeed, the workers' compensation system only authorizes the payment of "compensation" for workrelated injuries and does not permit the imposition of penalties. (Cf. State Dept. of Corrections v. Workmen's Comp.App. Bd. (1971) 5 Cal.3d 885, 888-889, 97 Cal.Rptr. 786, 489 P.2d 818.) Thus, while the 50 percent increase in compensation for discrimination under section 132a is sometimes characterized as a penalty, it has been held to be compensatory in two respects.
"First, the employee is compensated for damages directly caused as the result of the employer's prohibited discriminatory conduct.... Secondly, as the workers' compensation benefits ordinarily provided do not fully compensate the employee for his injuries and his other detriment, the allowance of the increase in benefits provides more nearly full compensation in those cases where the employer has discriminated against the employee because of the industrial injury." (Burton v. Workers' Comp. Appeals Bd. (1980) 112 Cal.App.3d 85, 90-91, 169 Cal.Rptr. 72.)
Finally, Industrial argues a section 132a award does not constitute "other benefits" because "that term necessarily has reference to other benefits awarded under the workers' compensation system, such as vocational rehabilitation and death benefits." This position rests on the premise that "compensation" and "other benefits," as those terms are used in the policy, mean essentially the same thing. However, as noted, section 3207 defines "compensation" to include "every benefit or payment conferred by Division 4 upon an injured employee, including vocational rehabilitation, or in the event of his ... death, upon his ... dependents...." (Ferguson v. Workers' Comp. Appeals Bd. (1995) 33 Cal.App.4th 1613, 1619, 39 Cal. Rptr.2d 806, italics omitted [the broad language of section 3207 "leaves no doubt" compensation includes vocational rehabilitation and other nonindemnity benefits provided by division 4 of the Labor Code].) Thus, if Industrial's position were correct, there would be no "other benefits" and the term would be entirely superfluous. This construction disregards the well-established rule that every term in a policy must be given effect whenever possible. (Martin Marietta Corp. v. Insurance Co. of North America (1995) 40 Cal.App.4th 1113, 1127, 47 Cal.Rptr.2d 670.) Therefore the term "other benefits," if it is to have any meaning at all, must refer to workers' compensation benefits not included within the definition of compensation, and so to benefits, if any, in addition to those provided in division 4 of the Labor Code.
Industrial cites several out-of-state cases in support of its position a 132a award is not among these "other benefits." All these cases are distinguishable. In each, the state's workers' compensation law permitted an employee to recover damages in a civil action against his or her employer for retaliatory discharge or some other form of discrimination based on a workrelated injury. The policies in question all contained language similar if not identical to that involved here, extending coverage to compensation and other benefits required of the insured under the state's workers' compensation law. The courts held there was no coverage under the policies and no duty to defend the employer against such an action. Although their reasoning varied somewhat, they reached this result because, among other things, *241 they concluded "compensation and other benefits" do not include civil damages. (County of Maverick v. Workers' Comp. Fund (Tex.App.1993) 852 S.W.2d 700; Richardson v. Owens-Illinois Glass Container, Inc. (W.D.Tex.1988) 698 F.Supp. 673; Vallier v. Oilfield Const. Co., Inc. (La.App.1986) 483 So.2d 212; Fidelity & Cas. Co. of New York v. Gaedcke Equipment Co. (Tex.App.1986) 716 S.W.2d 542; Rubenstein Lumber Co. v. Aetna Life & Cas. Co. (1984) 122 Ill.App.3d 717, 78 Ill. Dec. 541, 462 N.E.2d 660; Artco-Bell Corp. v. Liberty Mut. Ins. Co. (Tex.App. 1983) 649 S.W.2d 722; Arundale, Inc. v. Commercial Union Ins. Co. (E.D.Mo.1983) 572 F.Supp. 474.) This conclusion, while consistent with the law in this state, does not resolve the question before us because "compensation and other benefits" that may be awarded in a proceeding before the WCAB (as here) are distinct from "damages" recoverable in a civil lawsuit (as in the cases cited by Industrial). (La Jolla Beach & Tennis Club, Inc. v. Industrial Indemnity Co., supra, 9 Cal.4th at pp. 36, 42, 36 Cal.Rptr.2d 100, 884 P.2d 1048.)
Black's Law Dictionary defines a benefit as an "[advantage; profit; fruit; privilege; gain; interest.... Benefits are something to advantage of, or profit to, recipient." (Black's Law Diet. (6th ed.1990) p. 158.) The term is broad enough to include all the elements of a 132a award, i.e., increased compensation, the costs of recovery, reinstatement, and back wages and benefits, all of which redound to the advantage of a worker who suffers discrimination at the hands of his or her employer as the result of a workrelated injury.
We find support for this conclusion in Burton v. Workers' Comp. Appeals Bd., supra, 112 Cal.App.3d 85, 169 Cal.Rptr. 72. The employee in Burton suffered a workrelated injury for which he recovered ordinary workers' compensation benefits, including temporary disability payments. The employer was also directed to pay a 50 percent increase in compensation for discriminating against the employee in violation of section 132a. The employer promptly paid the 132a award except for the portion based on the temporary disability payments. As a result, the employer was then assessed a 10 percent penalty under section 5814 for unreasonable delay or refusal to pay "compensation." The issue in Burton was whether the penalty should be assessed against the entire 132a award or only against the part attributable to the unpaid temporary disability payments. In concluding the penalty applied to the entire award, the court relied on Gallamore v. Workers' Comp. Appeals Bd. (1979) 23 Cal.3d 815, 153 Cal.Rptr. 590, 591 P.2d 1242, where the Supreme Court held a section 5814 penalty "is to be computed by assessing 10 percent of the entire amount ultimately awarded for the particular class of benefit which has been unreasonably delayed or withheld." (Id. at p. 827, 153 Cal.Rptr. 590, 591 P.2d 1242, italics added.) The Burton court held it is the 132a award, rather than the unpaid temporary disability liability, that is the "class of benefit" to which this rule applies. As discussed above, the court held the increased compensation provided by section 132a is compensatory rather than punitive. First, it compensates the employee directly for damages caused by the employer's discriminatory conduct. The court explained: "This aspect of the section 132a civil/administrative remedy clearly points to it being a separate `class of benefit.'" (Burton v. Workers' Comp. Appeals Bd., supra, 112 Cal.App.3d at p. 90, 169 Cal. Rptr. 72.) Moreover, a 132a award provides more nearly full compensation for the employee's injuries and other detriment.
"In so providing more adequate compensation, the 50 percent increase does not seek to specifically more fully compensate individual classes of benefits but rather to increase compensation in general. This is supported by the language of section 4553 [then the measure of a 132a award] which specifies a 50 percent *242 increase in `compensation otherwise recoverable' rather than particular classes of benefits." (112 Cal.App.3d at p. 91, 169 Cal.Rptr. 72.)
In summary, Burton found a 132a award, or at least the increased compensation required by the statute, to be a "class of benefit" (and indeed a form of compensation) as opposed to a penalty. Similarly, we believe it is entirely consistent with an insured's objectively reasonable expectations to interpret the phrase "compensation and other benefits" under coverage A of the Industrial policy to include a 132a award, which is surely an "other benefit" if not also a form of "compensation."

5. The "Accident" Limitation
The California amendatory endorsement to the standard form policy states in part:
"With respect to Coverage A, Insuring Agreement IV, `Application of Policy' is amended to read as follows: [¶] This policy applies only to injury (1) by accident occurring during the policy period, or (2) by disease caused or aggravated by exposure during the policy period to conditions in the course of employment by the insured."[34] (Italics added.)
Industrial maintains the discharge of an employee in violation of section 132a necessarily is an intentional act and therefore is excluded by this "accident" limitation. And in a related argument, it contends coverage A also incorporates sections 533 of the Insurance Code and 1668 of the Civil Code, both of which preclude coverage for willful acts as a matter of public policy.[35] We consider these two arguments together.
Industrial cites us to a long list of insurance cases holding employment termination is an intentional act. Although this conclusion would seem to require little additional discussion, the context in which it was reached points up the difficulty in applying it here. The issue in most of the cited cases was whether an insurer had a duty under a general liability policy to defend an employer against a claim for bodily injury (i.e., emotional distress) resulting from wrongful termination. The policies generally limited coverage to injuries caused by an "occurrence," which in turn was defined as an "accident." In addition, the policies typically provided that the injury could have been "neither expected nor intended from the standpoint of the insured." That is, the policies looked both to the act that caused the injury and to the actor's state of mind. The specific question then was whether an intentional act that resulted in unintended harm was an "occurrence." The cases uniformly held it was not because termination of employment is always an intentional act and therefore cannot be an "accident." *243 There was no potential for coverage under the policy, in other words, regardless of whether or not the employer expected or intended the injury to occur. (Lipson v. Jordache Enterprises, Inc. (1992) 9 Cal. App.4th 151, 159, 11 Cal.Rptr.2d 271; Loyola Marymount University v. Hartford Accident & Indemnity Co. (1990) 219 Cal. App.3d 1217, 1224-1225, 271 Cal.Rptr. 528 and cases cited therein.) Similarly, in Merced Mutual Ins. Co. v. Mendez, supra, 213 Cal.App.3d 41, 261 Cal.Rptr. 273, we held there was no duty under a comparably-worded homeowner's policy to defend or indemnify the insured for damages caused by his intentional sexual acts. "[W]here the insured intended all of the acts that resulted in the victim's injury, the event may not be deemed an `accident' merely because the insured did not intend to cause injury." (Id. at p. 50, 261 Cal. Rptr. 273; see also Shell Oil Co. v. Winterthur Swiss Ins. Co. (1993) 12 Cal. App.4th 715, 750-751, 15 Cal.Rptr.2d 815.)
Still other cases have addressed an insurer's duty to defend a claim for wrongful termination in light of the proscription in Insurance Code section 533 against coverage for an insured's willful acts. In Clemmer v. Hartford Insurance Co. (1978) 22 Cal.3d 865, 151 Cal.Rptr. 285, 587 P.2d 1098, the Supreme Court endorsed a "clear line of authority in this state to the effect that even an act which is `intentional' or `willful' within the meaning of traditional tort principles will not exonerate the insurer from liability under Insurance Code section 533 unless it is done with a `preconceived design to inflict injury.'" (Id. at p. 887, 151 Cal.Rptr. 285, 587 P.2d 1098.) Appellate courts have since held that an act, to be willful within the meaning of the statute, must have been undertaken not only with the general intent to commit the act but also with the specific intent to cause harm. (See B & E Convalescent Center v. State Compensation Ins. Fund (1992) 8 Cal.App.4th 78, 94, 9 Cal.Rptr.2d 894; Republic Indemnity Co. v. Superior Court (1990) 224 Cal.App.3d 492, 501-502, 273 Cal.Rptr. 331.) Thus, Insurance Code section 533 requires a different analysis than the "occurrence" language discussed above because section 533 does not necessarily preclude coverage for intentional acts that result in unintended harm. (Id. at p. 503, 273 Cal.Rptr. 331; see also Shell Oil Co. v. Winterthur Swiss Ins. Co., supra, 12 Cal.App.4th at pp. 739-743, 15 Cal.Rptr.2d 815; United States Fid. & Guar. Co. v. American Employer's Ins. Co. (1984) 159 Cal.App.3d 277, 205 Cal. Rptr. 460.)
Both B & E Convalescent and Republic Indemnity concerned the right to a defense under the employer's liability part of a workers' compensation and employer's liability policy. In Republic Indemnity, the claim was for employment discrimination under the state Fair Employment and Housing Act (FEHA) based on a failure to take reasonable steps to accommodate an employee with cancer. The employee was later terminated. The court held Insurance Code section 533 did not preclude coverage, although termination is an intentional act, because it is not necessary to show an intent to injure in order to prevail on a "`failure to reasonably accommodate'" theory of discrimination. (Republic Indemnity Co. v. Superior Court, supra, 224 Cal.App.3d at p. 503, 273 Cal.Rptr. 331.)
The underlying claim in B & E Convalescent alleged a supervisory employee had been discharged for refusing to interfere with unionization efforts, and on account of her gender, age, and ethnic origin. The court initially concluded the claim was not barred by the exclusive remedy provisions of the workers' compensation law because it was the sort of claim, i.e., wrongful termination in violation of fundamental public policy, for which a separate tort action lies. (B & E Convalescent Center v. State Compensation Ins. Fund, supra, 8 Cal.App.4th at pp. 91-92, 9 Cal.Rptr.2d 894, referring to Tameny v. Atlantic Richfield Co. (1980) 27 Cal.3d 167, 164 Cal. Rptr. 839, 610 P.2d 1330. See also Gantt v. Sentry Insurance (1992) 1 Cal.4th 1083, *244 4 Cal.Rptr.2d 874, 824 P.2d 680.) Turning then to Insurance Code section 533, the court noted the Supreme Court had recently clarified its decision in Clemmer v. Hartford Insurance Co., supra, 22 Cal.3d 865, 151 Cal.Rptr. 285, 587 P.2d 1098. In J.C. Penney Casualty Ins. Co. v. M.K (1991) 52 Cal.3d 1009, 278 Cal.Rptr. 64, 804 P.2d 689, the court had explained: "Properly understood, Clemmer ... does not require a showing by the insurer of its insured's `preconceived design to inflict harm' when the insured seeks coverage for an intentional and wrongful act if the harm is inherent in the act itself." (Id. at p. 1025, 278 Cal.Rptr. 64, 804 P.2d 689.) The B & E Convalescent court held a Tameny termination is such an act, and one for which indemnification therefore is barred by Insurance Code section 533. (B & E Convalescent Center v. State Compensation. Ins. Fund, supra, 8 Cal.App.4th at pp. 97-98, 9 Cal.Rptr.2d 894.)
There appears to be no real dispute in the present case, nor could there be, that Melton's discharge of Martin was a deliberate act. The parties disagree, however, on the significance, if any, of Melton's state of mind at the time. That is, Industrial, in reliance on the "occurrence" cases cited above, maintains essentially that it is enough Melton acted intentionally and thus it is immaterial whether or not he intended to harm Martin. Melton, on the other hand, citing the Insurance Code section 533 cases, argues the policy precludes coverage only if he acted with a "preconceived design to inflict injury," which he denies doing. In fact, the language of part IV does not lend itself easily to either interpretation. It simply states: "This policy applies only to injury ... by accident occurring during the policy period...." It is not clear from this language whether the act or the injury, or both, must have been nonaccidental in order for the limitation to apply. But it might reasonably be interpreted to mean that an intentional act is covered if it causes only unintended harm. (See Olson v. American Bankers Ins. Co. (1994) 30 Cal.App.4th 816, 35 Cal.Rptr.2d 897 [coverage for death due to "bodily injury caused solely by an accident" is ambiguous as to whether it refers to accidental means or unforeseen result].)
In the case of a 132a violation, however, the act and the harm are essentially the same thing. The statute prohibits discrimination against an employee who has suffered a work-related injury. (Judson Steel Corp. v. Workers' Comp. Appeals Bd., supra, 22 Cal.3d 658, 150 Cal.Rptr. 250, 586 P.2d 564.) It does not require that the employee have sustained some additional injury as a result of the discriminatory treatment. "Section 132a ... addresses a breach of an employee's civil rights and applies regardless of whether that breach causes a medical injury." (City of Moorpark v. Superior Court, supra, 18 Cal.4th at p. 1154, 77 Cal.Rptr.2d 445, 959 P.2d 752.) Here, the WCJ expressly found that Melton fired Martin for having made known his intention to file a workers' compensation claim, and rejected as pretextual Melton's argument, made again here on appeal, that he was acting instead for legitimate business reasons. As the court explained in B & E Convalescent in a similar context, "An affirmative act which can only violate the law when it is accompanied by ... an impermissible motivation necessarily involves willful and intentional misconduct." (B & E Convalescent Center v. State Compensation Ins. Fund, supra, 8 Cal.App.4th at p. 95, 9 Cal.Rptr.2d 894.)
This is not to say that all acts or omissions in violation of section 132a are perforce intentional. Discrimination may be unintentional when it stems from a failure to take reasonable steps to accommodate a disabled worker (Republic Indemnity Co. v. Superior Court, supra, 224 Cal.App.3d 492, 273 Cal.Rptr. 331), or from the "disparate impact" of a facially neutral employment policy. (Melugin v. Zurich Canada (1996) 50 Cal.App.4th 658, 665, 57 Cal. Rptr.2d 781; Save Mart Supermarkets v. *245 Underwriters (N.D.Cal.1994) 843 F.Supp. 597, 606). In County of Santa Barbara v. Workers' Comp. Appeals Bd. (1980) 109 Cal.App.3d 211, 167 Cal.Rptr. 65, for example, the application of a policy that automatically reclassified disabled workers into lower paid positions was found to violate section 132a even though it was applied without regard to whether the disability was work-related. (Id. at p. 215, 167 Cal. Rptr. 65; see also Smith v. Workers' Comp. Appeals Bd. (1984) 152 Cal.App.3d 1104, 1110, fn. 5, 199 Cal.Rptr. 881.) Similarly, in Judson Steel Corp. v. Workers' Comp. Appeals Bd., supra, 22 Cal.3d 658, 150 Cal.Rptr. 250, 586 P.2d 564, a provision in a union contract permitted (but did not require) the employer to terminate the seniority status of any employee who had not worked for 12 consecutive months. The Supreme Court held application of the provision violated section 132a when the employee had missed work due to an industrial injury. (Id. at p. 669, 150 Cal. Rptr. 250, 586 P.2d 564.) Here, by contrast, Melton's discriminatory act, and so the resulting harm, plainly were intentional.
However, this conclusion does not resolve the issue before us because part IV of the insuring agreement is ambiguous in another important respect. Although it purports to limit coverage to accidental injuries, this is not always the case. As previously noted, where the conditions of compensation concur, an employer is liable, regardless of fault, for the compensation due under division 4 of the Labor Code for any injury sustained by an employee arising out of and in the course of the employment. (§ 3600; see also § 3208 [defining "injury" to include "any injury or disease arising out of the employment...." (italics added) ].) This includes intentional injuries. (Azevedo v. Industrial Acc. Com. (1966) 243 Cal.App.2d 370, 374, 52 Cal.Rptr. 283 (Azevedo I) [physical assault by employer].) As our Supreme Court explained recently:
"In a majority of jurisdictions, all or virtually all intentionally tortious acts committed by an employer against an employee in the course of employment are excluded from the workers' compensation system. [Citation.] These jurisdictions typically have statutes that provide, or are construed as providing, that only `accidental' workplace injuries are to be covered by workers' compensation [citations] or have statutes that explicitly exclude intentional torts [citations]. Courts also rely on general public policy considerations to exclude intentional torts from the compensation systems.... Employees in these jurisdictions are therefore free to pursue civil actions against employers that engage in intentionally tortious conduct.
"In California, the place of intentional torts in the workers' compensation system has been somewhat more complicated, for at least two reasons. First, the workers' compensation exclusivity statute (§ 3600), which declares that `any injury ... arising out of and in the course of ... employment' is covered by the Act, is unqualified by any reference to accident or intentional tort. Second, section 4553 provides that employees shall have their workers' compensation awards `increased [by] one-half if the employee's injury results from the employer's `serious and willful misconduct.' The Legislature, it would seem, has thereby evinced its intent to include at least some portion of what are classified as `intentional torts' within the workers' compensation system." (Fermino v. Fedco, Inc. (1994) 7 Cal.4th 701, 709, 30 Cal.Rptr.2d 18, 872 P.2d 559.)
More particularly, disabling injuries resulting from employment termination are compensable, and workers' compensation provides the employee's exclusive remedy unless the discharge comes within an express or implied statutory exception, or it resulted from a risk reasonably deemed to be outside the "compensation bargain." (Shoemaker v. *246 Myers, supra, 52 Cal.3d 1, 7, 16, 276 Cal. Rptr. 303, 801 P.2d 1054; Cole v. Fair Oaks Fire Protection Dist. (1987) 43 Cal.3d 148, 160, 233 Cal.Rptr. 308, 729 P.2d 743.)[36] If the injury arose out of and in the course of employment, the exclusive remedy provisions apply "notwithstanding that the injury resulted from the intentional conduct of the employer, and even though the employer's conduct might be characterized as egregious." (Shoemaker v. Myers, supra, 52 Cal.3d at p. 15, 276 Cal.Rptr. 303, 801 P.2d 1054. See also Livitsanos v. Superior Court (1992) 2 Cal.4th 744, 752, 7 Cal.Rptr.2d 808, 828 P.2d 1195["[T]he proposition that intentional or egregious employer conduct is necessarily outside the scope of the workers' compensation scheme is erroneous."].) Indeed, the exclusive remedy provisions bar a discharged employee's civil claim for emotional distress even in the absence of any compensable physical disability. (Id. at p. 754, 7 Cal.Rptr.2d 808, 828 P.2d 1195.) However, the workers' compensation law does not preempt a common law action for wrongful termination in violation of public policy, e.g., one based on sexual or racial discrimination, because such misconduct is not a normal part of the employment relationship. (Gantt v. Sentry Insurance, supra, 1 Cal.4th at p. 1100, 4 Cal.Rptr.2d 874, 824 P.2d 680.) Likewise, a section 132a violation falls outside the compensation bargain, and workers' compensation does not provide the employee's exclusive remedy. (City of Moorpark v. Superior Court, supra, 18 Cal.4th 1143, 1161, 77 Cal.Rptr.2d 445, 959 P.2d 752.)
It is because some intentional workplace injuries are compensable under the workers' compensation system, and because an employer is required to "secure the payment of compensation" by purchasing insurance against its liability for those injuries (§ 3700), that sections 533 of the Insurance Code and 1668 of the Civil Code do not apply to workers' compensation policies. Subject to approval by the Insurance Commissioner, a workers' compensation policy may restrict or limit liability insurance "in any manner whatsoever." (Ins.Code, §§ 11657-11660.) However,
"The authority for restrictions or exclusions in individual policies does not permit gaps in the coverage of the employer's ordinary liability for disability payments and medical expenses. The work[ers'] compensation law demands security for this ordinary liability in advance of injury. It does not pretermit this demand in the case of perils caused by the employer's willful tort. There is, then, a surface conflict between the compensation law's demand for secured compensation and the statutory policy against insurance for willful torts.
"The conflict disappears in the light of additional statutes. Labor Code section 4553 directs that the work[ers'] compensation otherwise recoverable shall be increased one-half when the employee is injured by the employer's serious and willful misconduct, while Insurance Code section 11661 prohibits insurance covering this additional compensation. The award for serious and willful misconduct *247 represents additional compensation over and above what we have termed the employer's `ordinary liability' for disability and medical expenses; each of the two awards represents a different kind of liability; that for serious and willful misconduct has the characteristics of a penalty superimposed upon the standard scale of payments. If, as [the insurer] contends, Insurance Code section 533 and Civil Code section 1668 apply to work[ers'] compensation liability, they overlay both ordinary compensation and the additional compensation for serious and willful misconduct. Given that scope, these provisions would deprive section 11661 of useful function.[37] The latter is a specialized expression of the same public policy expressed by the other two statutes, but evolved for the particular purposes of work[ers'] compensation coverage. The employer's inability to insure himself against liability for serious and willful misconduct amply fulfills the public policy banning insurance which tends to encourage willful injury. The public policy does not stand in need of additional support. For the purpose of the workers'] compensation system, Insurance Code section 11661 serves as sole spokesman of the public policy. Section 533 of the Insurance Code and section 1668 of the Civil Code do not apply to work[ers'] compensation insurance coverage and do not prohibit insurance against the employer's ordinary liability for disability compensation and medical expense, even when occasioned by his willful wrong." (Azevedo v. Abel, supra, 264 Cal.App.2d at pp. 457-458, 70 Cal.Rptr. 710 (Azevedo II), fns. omitted.)
When Azevedo II was decided in 1968, section 132a contained no provision for the payment of additional compensation; it simply made it a misdemeanor for an employer to discriminate against an employee because the employee had filed or made known his or her intention to file a workers' compensation claim. (Stats. 1965, ch. 1513, § 36, p. 3562.) That is, only section 4553 at the time imposed a compensation "penalty," as distinct from "ordinary liability," for an employer's willful misconduct.
Section 132a was repealed in 1972 and replaced with a new version providing, in addition to criminal sanctions, that an employer who violated the statute was subject to section 4553. (Stats.1972, ch. 874, § 1, p. 1545.) As previously noted, section 132a was amended again in 1982 to eliminate this reference to section 4553 while at the same time incorporating its provisions for the payment of additional compensation. Consequently, in the present circumstances, unlike those in Azevedo II, section 4553 and Insurance Code section 11661 do not work to resolve the "surface conflict between the compensation law's demand for secured compensation and the statutory policy against insurance for willful torts." This is so because Insurance Code section 11661 does not apply by way of section 4553 to prohibit insurance against an employer's 132a liability for additional compensation. It is true as well because the requirement an employer secure the payment of "compensation" (§ 3700) refers to the compensation due under division 4 of the Labor Code (§ 3207), which does not include section 132a. An employer is neither required to secure the payment of any additional compensation *248 due under section 132a, nor expressly prohibited from doing so.
Nonetheless, the rationale underlying the decision in Azevedo II still applies with equal force in the present situation. If sections 533 of the Insurance Code and 1668 of the Civil Code were to apply to workers' compensation insurance, they would bar coverage for all intentional workplace injuries, including those that are compensable under the law, notwithstanding the requirement that an employer insure itself against its liability for compensation. The accident limitation in part IV of the policy, if it were strictly applied, would have the same effect. An employer who had such a policy, and no more, would be in violation of the workers' compensation law.
Industrial all but concedes in its supplemental briefing that the accident limitation does not always mean what it says.[38] Industrial acknowledges, based on Azevedo II, that the limitation does not exclude coverage for an employer's "ordinary liability" for compensation for intentional workplace injuries, in which case it says the limitation is "simply superceded by the provisions of the law" that are incorporated into the policy. It is perhaps more accurate to say the accident limitation, to the extent it is more restrictive than the law allows, is unenforceable. (See Howell v. State Farm Fire & Casualty Co. (1990) 218 Cal.App.3d 1446, 1453-1454, 267 Cal. Rptr. 708.) Industrial nevertheless insists that the limitation, as well as the two statutory public policy exclusions,[39] continue to foreclose coverage for an employer's 132a liability because it is not a form of "ordinary liability." The problem with this argument is that nothing in the insurance policy or the law clearly distinguishes between an employer's "ordinary liability" for medical injuries and its "nonordinary" liability for section 132a discrimination.
The employee in Azevedo II did not seek the additional compensation "penalty" authorized by section 4553 for an employer's serious and willful misconduct. But if she had, as the court made clear in the passage quoted above, coverage for the employer's liability for the additional compensation would have been barred by the express terms of Insurance Code section 11661. For the reasons discussed above, the same statute might also have barred coverage for an employer's liability for additional compensation under section 132a between the time section 132a was reenacted in 1972 and the time it was amended in 1982 to delete the reference to section 4553.[40] But following the 1982 amendment, there was no statutory prohibition, either direct or indirect, against coverage for an employer's 132a liability.
Nor does the policy itself differentiate between an employer's "ordinary liability" and its 132a liability. By contrast, the amendatory endorsement specifically excludes coverage for an employer's liability for the additional compensation due under *249 section 4553.[41] There is no comparable exclusion for the employer's section 132a liability.
Industrial's position comes down to an argument that Melton should have known the workers' compensation law does not, in the words of Azevedo II, "pretermit this demand [to secure the payment of compensation] in the case of perils caused by the employer's willful tort." (264 Cal.App.2d at p. 457, 70 Cal.Rptr. 710.) Put a different way, Industrial would ascribe to Melton the knowledge that part IV of the insuring agreement was meant to apply only to his 132a liability, and not to his "ordinary liability" for intentional injuries, even though neither the policy nor the law makes any such distinction. This argument supposes a level of legal sophistication not even Industrial demonstrated at the time.
We must read the policy "as a layman would read it and not as it might be analyzed by an attorney or an insurance expert." (Crane v. State Farm Fire & Cas. Co. (1971) 5 Cal.3d 112, 115, 95 Cal. Rptr. 513, 485 P.2d 1129.) "Even if a provision raises doubts as to coverage in the minds of legally trained observers due to a sophisticated legal distinction, courts will not assume the distinction was incorporated into the policy." (Vandenberg v. Superior Court (1999) 21 Cal.4th 815, 840, 88 Cal.Rptr.2d 366, 982 P.2d 229.) "An exclusionary clause `must be conspicuous, plain and clear.'" (De May v. Interinsurance Exchange (1995) 32 Cal.App.4th 1133, 1137, 38 Cal.Rptr.2d 581.) "[A]n exclusion or-limitation on coverage must be clearly stated and will be strictly construed against the insurer. If an exclusion ambiguously lends itself to two or more reasonable constructions, the ambiguity will be resolved against the insurer and in favor of coverage." (Smith Kandal Real Estate v. Continental Casualty Co. (1998) 67 Cal.App.4th 406, 414, 79 Cal.Rptr.2d 52.)
Section 132a is "quite different" from other workers' compensation remedies and need not necessarily be treated the same. (City of Moorpark v. Superior Court, supra, 18 Cal.4th at p. 1154, 77 Cal.Rptr.2d 445, 959 P.2d 752.) But what distinguishes section 132a from the others is not intentional conduct. Industrial, in effect, would have us read a statutory coverage exclusion into the preamble to section 132a, which provides: "It is the declared policy of this state that there should not be discrimination against workers who are injured in the course and scope of their employment." Certainly this policy would be advanced by prohibiting an employer from insuring itself against its liability for discriminatory conduct. And indeed it appears Insurance Code section 11661 may have served this purpose prior to the amendment of section 132a in 1982. Notably, however, the Legislature did not amend Insurance Code section 11661 at the same time or enact a comparable statute making section 132a liability uninsurable.
Moreover, this is not a case where Industrial attempted to limit its exclusion, as it could have, to an employer's discriminatory conduct in violation of section 132a.[42] *250 Instead the policy purports to exclude coverage for all nonaccidental workplace injuries, ordinary or nonordinary, when in fact the former generally are covered. Part IV of the insuring agreement, insofar as it seeks to restrict coverage to accidental injuries, is honored in the breach far more than the observance. In this respect the accident limitation is not merely ambiguous but practically meaningless.
Notwithstanding this ambiguity, we must determine whether, in the context of the entire policy and under the circumstances of this case, coverage for an employer's 132a liability is consistent with the insured's "objectively reasonable expectations." (Bank of the West v. Superior Court, supra, 2 Cal.4th at p. 1265, 10 Cal. Rptr.2d 538, 833 P.2d 545.) Language in an insurance policy cannot be found to be "`ambiguous in the abstract.'" (Ibid.) Therefore, it is necessary to consider whether an employer's 132a liability for discrimination is different enough from its "ordinary liability" for medical injuries that an employer could not reasonably expect coverage for the former. We believe it is not so different for the reasons we have already discussed. First, the two types of liability are not distinguished one from the other by intentional conduct; an employer's ordinary liability for nonaccidental injuries is covered under the policy notwithstanding the accident limitation. Second, although the two types of liability arise from different sorts of injuries, if an employee were to suffer a medical injury as the result of the employer's discriminatory conduct, the employer's liability for this injury presumably would be covered under the policy. That is, a 132a violation can give rise to both kinds of liability. Finally, while a section 132a award has some of the characteristics of a penalty, it is also compensatory in the manner of ordinary workers' compensation benefits. Therefore, we cannot say as a matter of law it was unreasonable for Melton to expect coverage under this policy for his section 132a liability.
In summary, we conclude the accident limitation is ambiguous because it fails to clearly distinguish between what it is arguably meant to exclude, i.e., an employer's 132a liability, and what it purports to exclude but does not, i.e., an employer's ordinary liability for nonaccidental workplace injuries. Accordingly, we resolve the ambiguity against Industrial and in favor of coverage. (Smith Randal Real Estate v. Continental Casualty Co., supra, 67 Cal. App.4th at p. 414, 79 Cal.Rptr.2d 52.)

6. Discharge Outside the Policy Period
Martin was injured on April 24 and discharged by Melton on August 21 of 1984. Sierra Signs's policy with Industrial expired on August 1, 1984, after which the business was insured by a different company. Thus, Martin's injury occurred during Industrial's policy period but his discharge did not. Part IV of the policy's insuring agreements provides in part: "This policy applies only to injury (1) by accident occurring during the policy period...." Industrial maintains that the operative date for determining coverage for Melton's 132a liability is the date Martin was fired rather than the date of the event that caused him to be fired, i.e., the date he was injured or the date he first made known his intention to file a workers' compensation claim based on the injury. On this premise, Industrial argues Melton's 132a liability was not covered under the policy (even if it otherwise might have been). Assuming, without deciding, the premise is correct, *251 we conclude Industrial is estopped to deny coverage on this basis.
The record leaves some question as to whether the trial court relied on the policy period provision to reach its conclusion there was no coverage for Melton's 132a liability. In announcing its coverage ruling the court said:
"... the Court finds and determines that the firing of Martin by plaintiff Mr. Melton is not an accident within the meaning of the policy nor is Mr. Melton's discrimination against Mr. Martin under Labor Code Section 132a and that is the basis of the Court's ruling or I should say that that alone is enough to convince the Court that there's nono coverage. However, I do believe that Insurance Code 553 [sic] and Civil Code Section 1668 do have some application inspite [sic] of Azevedo versus Abel because I think we are talking about something more than ordinary compensation benefits which were at issue in that case. There's also as another basis or bases that it was [not] within the policy period, although I believe the plaintiff will contend that there is an estoppel there. But nonetheless the termination took place I believe it was August 21st, 1984 and the policy ran to August 1st, 1984."
The court subsequently instructed the jury it had found there was no coverage on the first two of these three grounds, i.e., the accident limitation and the two public policy statutes.
The court ruled Industrial was not estopped to assert its coverage defenses (meaning presumably its accident limitation and public policy defenses) because Melton was aware of Industrial's no-coverage position notwithstanding the company's failure to send him a 132a letter, and because Melton therefore had not detrimentally relied on a belief Industrial would indemnify him against a 132a award. However, the court left it to the jury to decide whether Industrial had impliedly waived its right to deny coverage by "conduct[ing] itself in a way that was so inconsistent with an intent to enforce its right to deny coverage under the policies [sic] so as to induce a reasonable belief that Industrial Indemnity had relinquished such right." In this regard it also instructed the jury that when an insurance company relies on specific grounds to deny coverage, it waives its right to rely in subsequent litigation on any other grounds a reasonable investigation would have uncovered.
Because the doctrines of waiver and estoppel have played such a significant role in this case, and because they are so often confused with one another (as they were here), we will consider Industrial's final no-coverage argument after examining the two doctrines in greater detail.

B. Waiver and Estoppel
The issues of waiver and estoppel typically arise in insurance cases when the existence of coverage under a policy turns on the resolution of disputed factual questions underlying a third party claim against the insured. In this situation, where the potential for coverage exists, the insurer is obligated to provide a defense but may reserve its right to refuse to indemnify the insured against an eventual judgment, or to withdraw from the defense prior to judgment, on the ground the claim is not covered under the policy. An insurer who provides a defense without a reservation of rights, however, may thereby waive, or be estopped to assert, its coverage defenses. (See Croskey et al, Cal. Practice Guide: Insurance Litigation, supra, K 7:709 et seq., p. 7B-58.1.)
"`[I]f a liability insurer, with knowledge of a ground of forfeiture or noncoverage under the policy, assumes and conducts the defense of an action brought against the insured, without disclaiming liability and giving notice of its reservation of rights, it is thereafter precluded in an action upon the policy from setting up such ground of forfeiture or noncoverage. In other words, the insurer's unconditional *252 defense of an action brought against its insured constitutes a waiver of the terms of the policy and an estoppel of the insurer to assert such grounds.'" (Miller v. Elite Ins. Co. (1980) 100 Cal.App.3d 739, 755, 161 Cal. Rptr. 322.)
"The insurer's undertaking defense of the third party suit creates a high potential for misleading the insured, by creating the impression the insurer is not disputing coverage. And, the insured may rely thereon by failing to retain independent counsel to negotiate or defend the action." (Croskey et al., Cal. Practice Guide: Insurance Litigation, supra, 7:712, p. 7B-59.)
Similarly, when an insurer limits its reservation of rights to certain grounds, it thereby "waives" its right to contest coverage on any other grounds of which it was, or should have been, aware. (Canadian Ins. Co. v. Rusty's Island Chip Co. (1995) 36 Cal.App.4th 491, 497-498, 42 Cal. Rptr.2d 505; Alta Cal. Regional Center v. Fremont Indemnity Co. (1994) 25 Cal. App.4th 455, 463-465, 30 Cal.Rptr.2d 841.) "Application of the waiver rule to disputes over whether coverage exists is designed as an incentive to compel an insurance company to fulfill its duty to thoroughly investigate a claim before denying coverage." (Alta Cal. Regional Center at p. 465, 30 Cal.Rptr.2d 841.) In fact, however, this "waiver rule" is grounded in the doctrine of equitable estoppel inasmuch as it also generally requires a showing of detrimental reliance on the part of the insured. (Waller v. Truck Ins. Exchange, Inc., supra, 11 Cal.4th at pp. 31-34, 44 Cal. Rptr.2d 370, 900 P.2d 619 [rejecting the "automatic waiver" rule in such circumstances and disapproving Alta Cal. Regional Center to the extent it relied on the rule].)
Thus, although courts often speak in terms of waiver, the principle most commonly at work in insurance cases derives from the doctrine of equitable estoppel.
"`Although the terms "waiver" and "estoppel" are sometimes used indiscriminately, especially in the law of insurance, they are two distinct and different doctrines that rest on different legal principles. Strictly speaking, "waiver" is used to designate the act, or the consequences of the act, of one side only, while "estoppel" is applicable where the conduct of one side has induced the other to take such a position that it would be injured if the first should be permitted to repudiate its acts.' [Citations.]" Insurance Co. of the West v. Haralambos Beverage Co. (1987) 195 Cal.App.3d 1308, 1320, fn. 6, 241 Cal.Rptr. 427 (disapproved on other grounds in Vandenberg v. Superior Court, supra, 21 Cal.4th at p. 841, fn. 13, 88 Cal.Rptr.2d 366, 982 P.2d 229, and Buss v. Superior Court (1997) 16 Cal.4th 35, 50, fn. 12, 65 Cal.Rptr.2d 366, 939 P.2d 766.)
Waiver is the voluntary relinquishment of a known right and looks solely to the intent of the waiving party. (Waller v. Truck Ins. Exchange, Inc., supra, 11 Cal.4th at p. 31, 44 Cal.Rptr.2d 370, 900 P.2d 619.) It does not require any act or conduct by the other party. (DRG/Beverly Hills, Ltd. v. Chopstix Dim Sum Cafe & Takeout III, Ltd. (1994) 30 Cal.App.4th 54, 59, 35 Cal.Rptr.2d 515.) "The waiver may be either express, based on the words of the waiving party, or implied, based on conduct indicating an intent to relinquish the right." (Waller v. Truck Ins. Exchange, Inc., supra, 11 Cal.4th at p. 31, 44 Cal.Rptr.2d 370, 900 P.2d 619.) An insurer can "waive" policy provisions that would otherwise defeat coverage. (Miller v. Elite Ins. Co., supra, 100 Cal.App.3d at p. 754, 161 Cal.Rptr. 322.)
"To constitute a waiver there must be an existing right, a knowledge of its existence, and an actual intention to relinquish it, or such conduct as warrants an inference of the relinquishment. It is a voluntary act and implies an abandonment of a right or privilegean election to dispense with something of value or to forego some advantage which one might, at his option, have demanded or *253 insisted upon." (McDanels v. General Ins. Co. (1934) 1 Cal.App.2d 454, 460, 36 P.2d 829.)
Equitable estoppel, on the other hand, looks both to the statements or conduct of the party to be estopped and to the actions of the other party taken in reliance thereon. "The object of equitable estoppel is to `prevent a person from asserting a right which has come into existence by contract, statute or other rule of law where, because of his conduct, silence or omission, it would be unconscionable to allow him to do so.' [Citation.]" (Skulnick v. Roberts Express, Inc. (1992) 2 Cal.App.4th 884, 891, 3 Cal.Rptr.2d 597.)
An equitable estoppel normally has four elements: (1) the party to be estopped must have known the true facts; (2) he must have intended that his conduct be acted upon, or must have acted in such a manner that the party asserting the estoppel had a right to believe the conduct was so intended; (3) the party asserting the estoppel must have been ignorant of the true facts; and (4) the party asserting the estoppel must have relied on the conduct to his detriment. (Insurance Co. of the West v. Haralambos Beverage Co., supra, 195 Cal.App.3d at p. 1321, 241 Cal. Rptr. 427; Miller v. Elite Ins. Co., supra, 100 Cal.App.3d at p. 754, 161 Cal.Rptr. 322. See also Evid.Code, § 623.)
The party to be estopped need not have acted with actual fraudulent intent in order for an estoppel to arise. "Negligence that is careless and culpable conduct is, as a matter of law, equivalent to an intent to deceive and will satisfy the element of fraud necessary to an estoppel." (Crestline Mobile Homes Mfg. Co. v. Pacific Finance Corp. (1960) 54 Cal.2d 773, 778-779, 8 Cal.Rptr. 448, 356 P.2d 192.) An estoppel may arise from silence where there is a duty to speak. (Skulnick v. Roberts Express, Inc., supra, 2 Cal. App.4th at p. 891, 3 Cal.Rptr.2d 597.)
Ordinarily, an estoppel cannot create coverage under an insurance policy where such coverage did not originally exist. (Miller v. Elite Ins. Co., supra, 100 Cal.App.3d at p. 755, 161 Cal.Rptr. 322.) "`"The rule is well established that the doctrines of implied waiver and of estoppel, based upon the conduct or action of the insurer, are not available to bring within the coverage of a policy risks not covered by its terms, or risks expressly excluded therefrom....""' (Aetna Casualty & Surety Co. v. Richmond (1977) 76 Cal.App.3d 645, 653, 143 Cal.Rptr. 75, citing Insurance Co. of North America v. Atlantic National Ins. Co. (4th Cir.1964) 329 F.2d 769, 775.) However, an equally well-established exception to this general rule applies where the insurer, although aware of a ground of noncoverage, defends an action against its insured without reserving its right to disclaim liability. (Miller v. Elite his. Co., supra, 100 Cal. App.3d at p. 755, 161 Cal.Rptr. 322, citing Insurance Co. of North America v. Atlantic National Ins. Co., supra, 329 F.2d at pp. 775-776.) "An insurer can be estopped from raising coverage defenses if, knowing of the grounds of noncoverage, it provides a defense under the policy without a reservation of rights, and the insured reasonably relies on this apparently unconditional defense to his detriment." (State Farm Fire & Casualty Co. v. Jioras (1994) 24 Cal.App.4th 1619, 1626, 29 Cal.Rptr.2d 840.)
The existence of an estoppel is a nonjury fact question to be determined by the trial court. (DRG/Beverly Hills, Ltd. v. Chopstix Dim Sum Cafe & Takeout III, Ltd., supra, 30 Cal.App.4th at p. 61, 35 Cal.Rptr.2d 515.)
Turning to the present case, we note that at no time between the filing of Martin's 132a petition in 1985 and Melton's bad faith action in 1989 did anyone from Industrial, either directly or through Yrulegui, ever tell Melton his 132a liability was not covered by his workers' compensation policy because Martin was fired after the policy's expiration. Indeed, until Rossi's letter *254 in 1988, Industrial never gave Melton any reason at all for its denial of coverage. And within Industrial itself, the rationale for its coverage position underwent several changes during this same period.
Normally Industrial's reasons would have been provided by a 132a letter. None, of course, was sent in this case. However, in two separate telephone conversations on August 26, 1985, shortly after Martin filed his 132a petition, Valerie Souza and Richard Yrulegui each reportedly told Melton he would be personally liable for an award if Martin were to prevail on his discrimination claim. Neither used the term "coverage" nor did either explain the basis for Industrial's no-coverage position. This position presumably was the same as the one set out in Industrial's sample 132a letter, which disclaimed coverage on only two grounds: the policy applied only to events resulting in bodily injury, and Insurance Code section 533 barred coverage for willful acts, including discrimination.[43] Notably, the letter did not rely either on the policy's coverage clause ("all compensation and other benefits required of the insured by the workers' compensation law") or on the "accident" limitation.
More to the point, neither Souza nor Yrulegui denied coverage on the ground the policy had lapsed. There is no question Souza was aware of the relevant dates: initially she had denied Martin's injury claim because the doctor's report mistakenly listed the date of injury as August 3, 1984, three days beyond the policy period; and Martin's 132a petition alleged he was fired "on or about August 20, 1984," well after the policy had expired.
Andre Hassid, the manager of Industrial's claims counsel department, would later explain it was Industrial's policy to provide a courtesy defense in 132a cases based on the date of an employee's industrial injury, rather than on the date of the discriminatory act giving rise to the 132a claim. If so, the potential for confusion from this policy is evident: by providing a defense, Industrial not only might create the impression it was accepting coverage, but might also cause the insured as a result to avoid tendering its defense to the subsequent carrier. In this situation, Industrial was obligated to tell Melton his policy had expired if it intended to rely on that ground to deny coverage. Since the operative date for purposes of coverage might have been either the date of injury or the date of discharge, Industrial's blanket denial of coverage was not enough to alert Melton to Industrial's position on the subject.
But we need not decide whether Industrial's initial failure to specify reasons for denying coverage was sufficient in itself to create an estoppel. Industrial's posture in the case changed significantly late in 1986 after Yrulegui attended a workers' compensation seminar where he learned for the first time of a legal argument in favor of coverage for an employer's 132a liability. As a result, Yrulegui told Melton there was now a "potential coverage dispute" and his 132a liability might in fact be covered under his policy with Industrial. Industrial also agreed to pay for Cumis counsel and authorized Yrulegui to begin settlement negotiations with Martin. All these actions clearly were inconsistent *255 with the position there was no coverage due to the policy's expiration.
As discussed above, the coverage argument stemmed from a 1982 change in section 132a that removed a reference to section 4553 (the serious and willful misconduct statute). The net effect of the change, the argument went, was that a workers' compensation insurer was no longer prohibited by section 11661 of the Insurance Code from insuring against an employer's section 132a liability. Thus, the employer's liability would be covered unless the policy itself or some other statutory provision excluded it. It is curious, then, that Industrial acknowledged the possibility of coverage under this new theory because up until then it had taken the position, internally at least, that the policy language (allegedly restricting coverage to bodily injury) and Insurance Code section 533 (precluding coverage for willful acts) both served this specific exclusionary purpose. In other words, the new "coverage argument" really only eliminated a possible statutory exclusion upon which Industrial had never relied to deny coverage in the first place, and which therefore did not require Industrial to reevaluate its coverage position.
Industrial's change of position was not limited to discussions within the company. Yrulegui testified he explained the new coverage argument to Mitchell "very thoroughly." And Mitchell testified he understood the argument related to the lack of a specific provision in the policy excluding coverage for an employer's 132a liability. Thus, by altering its position and acknowledging the possibility of coverage, Industrial arguably created the impression it was not asserting such an exclusion existed. In these circumstances, the fact Martin had been discharged after the policy's expiration took on greater significance because it provided Industrial with a legal basis to deny coverage irrespective of the new coverage theory.
Even though coverage was now in question, Industrial did not disclaim responsibility for Melton's 132a liability for this reason, or any other. Rather, it continued to provide a defense without taking a formal coverage position or explicitly reserving its rights to disclaim coverage. Industrial contends that its agreement to provide Melton with Cumis counsel was a "sufficient substitute" for a reservation of rights because it put Melton on notice of a coverage dispute. Certainly it would have made little sense for Industrial to pay for Cumis counsel if it were accepting coverage outright but, as noted, the rest of Industrial's position with regard to Cumis counsel was confusing at best.[44]
*256 Moreover, many of Industrial's other actions were inconsistent with the view it was denying coverage. Most notably, Industrial attempted, initially without consulting Melton, to settle the case with its own money.[45] And it continued to represent to Melton it was making efforts to settle even after it had made the decision to stop for fear of giving "more argument Mitchell will use to make us pay if [we] lose." In addition, Yrulegui expressed the opinion to Mitchell that Industrial would pay some, if not all, of a 132a award. Rossi later confirmed Industrial's willingness to contribute money toward the award, even after he sent Melton a letter in 1988 denying coverage. And Industrial passed up the opportunity to adjudicate the issue of coverage at the 132a hearing, a few months after the issue arose, even though Yrulegui appeared at the hearing on Industrial's behalf.
It is useful to point out again in this connection that Industrial's coverage position was not dependent on the resolution of disputed factual issues at the upcoming 132a hearing. It turned instead on purely legal questions involving policy interpretation and application of certain statutory provisions. In short, there was nothing to prevent Industrial from taking a position as soon as the "potential coverage dispute" arose. The only reasonable conclusion to be drawn from Industrial's actions between the time Yrulegui returned from the seminar in 1986 until Rossi sent a nocoverage letter in 1988 is that Industrial, to the extent it gave the matter much thought, was hoping to resolve Martin's 132a claim without having to test its position. This would have been in keeping with its practice in the usual case where a 132a petition is filed concurrently with an injury claim, i.e., to "settle" the 132a claim without appearing to acknowledge coverage.
In all material respects, Dennis Rossi's April 5, 1988, no-coverage letter was the same as the 132a letter in Industrial's claim manual. It cited the same two grounds for denying coverage, and only those two: part IV of the policy limited coverage to bodily injury, and Insurance Code section 533 prohibited coverage for intentional acts. Again, these two grounds were not affected at all by the "coverage argument" raised at the seminar in 1986. Rossi testified that, when he wrote the letter, he was aware of no other grounds for denying coverage.
In February of 1989, once the 132a decision was final, Richard Belardinelli wrote to Industrial requesting that it reconsider its coverage position. He argued, among other things, that Industrial had waived its coverage defenses, or was estopped to assert them, because it had misled Melton into believing it would pay any 132a award. Industrial's response came in a letter from Andre Hassid the following month. Hassid disputed each of Belardinelli's contentions, including waiver/estoppel, and once again denied coverage. In so doing, he *257 relied on the public policy prohibiting insurance against intentional acts, citing both Insurance Code section 533 and, for the first time, Civil Code section 1668. Also for the first time, he argued coverage was excluded by the "accident" limitation in part IV of the policy. He did not contend coverage was limited by part IV to bodily injury, nor that a 132a award was not a form of "compensation and other benefits." Most importantly, Hassid's letter, like Rossi's before it, did not cite as a reason for denying coverage the fact Melton had discharged Martin after the policy expired.
Under these circumstances, Industrial is now estopped to argue Melton's 132a liability was not covered due to the policy's expiration. Although Industrial was aware of the policy period argument and had in fact initially asserted it to disclaim coverage for Martin's injury claim, Industrial never raised it in connection with the 132a petition. As a result, Melton was denied the opportunity to tender his defense of the 132a claim to his subsequent workers' compensation carrier in a timely manner. Moreover, Industrial's delay in taking a formal coverage position, coupled with its settlement efforts, caused Melton to refrain from negotiating directly with Martin, whose back wages were accumulating all the while. Since, as we have determined, the grounds Industrial relied on in refusing to pay the 132a award proved to be without merit, it would be inequitable to permit the company at this late stage to escape responsibility for the award because of its silence.[46]

C.-G.[]

IV. CONCLUSION
We affirm the judgment holding Industrial Indemnity Company liable to Keith Melton and Sierra Signs for breach of the implied covenant of good faith and fair dealing. We do so, however, on different grounds than those upon which the trial court and jury relied. Unlike the court, we conclude Melton's section 132a liability was covered under the workers' compensation portion (coverage A) of his workers' compensation and employers' liability policy with Industrial. We hold in particular that an employer's section 132a liability comes within the policy's general coverage for "compensation and other benefits required of the insured by the workers' compensation law." We hold further, and more significantly, that coverage for this liability is not precluded by the "accident" limitation in part IV of the insuring agreements, nor by the public policy expressed in sections 533 of the Insurance Code and 1668 of the Civil Code against insurance for willful acts. As we have explained, the accident limitation is ambiguous, and the statutory exclusions are inapplicable, because they would, if applied, deny coverage for nonaccidental workplace injuries that are compensable under the workers' compensation law, and against which an employer is required by law to obtain insurance.
Also on the subject of coverage, we hold Industrial is estopped to assert as a basis for denying coverage that Melton's section 132a violation did not occur until after the policy expired.
Because Industrial had a contractual duty to defend and indemnify Melton against the section 132a claim, we have not addressed Industrial's objections to the two theories of bad faith liability submitted to the jury: that Industrial failed unreasonably to satisfy its obligations arising *258 under a "contract by waiver," or that Industrial, once it undertook to provide Melton with a defense, assumed a duty of good faith and fair dealing irrespective of the policy's application. Nor have we considered Industrial's other contentions that suppose there was no coverage under the policy and no estoppel to deny coverage.
On the subject of damages, we conclude the evidence is sufficient to support the jury's award of attorney fees as damages pursuant to Brandt v. Superior Court, (1985) 37 Cal.3d 813, 210 Cal.Rptr. 211, 693 P.2d 796 ($380,000), as well as its award of punitive damages ($20,000). As for the jury's award of compensatory damages other than attorney fees ($250,000), we find the evidence fails to support Melton's claims for economic losses to the extent any amounts he expended in the past have been increased to allow for prejudgment interest under the guise of "present value" ($18,109.29). Nor is there support for Melton's claim he is entitled to recover economic damages representing the lost opportunity cost of capital ($23,441.83).
We have several options in this situation. We can affirm the judgment of liability but vacate the damages award and remand for a new trial on that issue only. Or we can modify the award and affirm the judgment as modified. (See Cunningham v. Simpson (1969) 1 Cal.3d 301, 310, 81 Cal. Rptr. 855, 461 P.2d 39; 9 Witkin, Cal. Procedure, supra, Appeal, § 754, p. 780.) Here its verdict fails to disclose just how the jury calculated compensatory damages, but the amount appears to correspond closely to Joseph Penbera's testimony regarding Melton's economic damages. For this reason, we elect to pursue a third option. We will affirm the judgment of liability, and the jury's awards of Brandt damages and punitive damages. However, we will vacate its award of compensatory damages and remand the matter for a new trial on that issue only, unless Melton consents to a reduction in the amount.

V. DISPOSITION
The judgment of liability is affirmed. The jury's award of damages is affirmed in all respects other than its award of $250,000 in compensatory damages. Its award of that amount is vacated and the matter is remanded for a new trial on that issue only, unless Melton, within 30 days from the filing of our decision, files with the clerk of this court, and serves upon Industrial, a written consent to a reduction of the award to $208,448.88, in which event the judgment will be modified to award Melton compensatory damages in this lessor amount, and as so modified affirmed in its entirety. (Cal. Rules of Court, rule 24(c).)
Respondent is awarded costs on appeal.
HARRIS, Acting P.J., and LEVY, J., concur.
NOTES
[*] Under California Rules of Court, rules 976(b) and 976.1, only parts I, IIA, III, IIIA, IIIB, IV, and V are certified for publication.
[**] In denying review, the Supreme Court ordered that the opinion be not officially published. (See California Rules of CourtRules 976 and 977.)
[1] Unless otherwise noted, future statutory references are to the Labor Code.
[2] We will refer to Keith Melton and Sierra Signs interchangeably in the remainder of this opinion.
[3] Our future references to Mr. Yrulegui are meant to also include his law firm.
[***] See footnote *, ante.
[30] Industrial moved unsuccessfully in the trial court to dismiss Melton's complaint on the ground his claims fell within the exclusive jurisdiction of the WCAB. It renews this objection in a footnote to its opening brief on appeal. As the court correctly pointed out in denying the motion however, the Board's jurisdiction does not extend to claims by an employer (as opposed to an employee) against the employer's workers' compensation carrier. (Salimi v. State Comp. Ins. Fund (1997) 54 Cal.App.4th 216, 62 Cal.Rptr.2d 640.) "[T]he WCAB was not created to adjudicate claims of bad faith and breach of contract made by an employer against a compensation carrier. In fact, the WCAB has no jurisdiction to grant the remedies to which the employer may be entitled." (Id. at p. 222, 62 Cal.Rptr.2d 640.)
[31] Melton asserts the law governing interpretation of insurance policies underwent a change beginning in 1990, and he argues the Industrial policy must be interpreted using the law in existence during the period from 1983 to 1985 when the present coverage issue arose. Assuming the law changed, we will apply the rule that new judicial decisions apply to cases still open. (Cf. Waller v. Truck Ins. Exchange, Inc. (1995) 11 Cal.4th 1, 24-25, 44 Cal.Rptr.2d 370, 900 P.2d 619.)
[32] As noted, neither Rossi's letter of April 5, 1988, nor Hassid's of March 17, 1989, relied as a basis for denying coverage on the second and third reasons now offered by Industrial in support of its no-coverage position. The court instructed the jury that an insurance company that relies on specified grounds for denying a claim waives the right thereafter to rely on other grounds discoverable through a reasonable investigation. For reasons explained below, we will conclude Industrial is estopped to assert reason number three (expiration of the policy period). However, we will consider reason number two (the coverage clause) because it presents a purely legal question and because it does not appear Melton was prejudiced by Industrial's failure to assert it.
[33] As noted above, the previous version of section 132a provided that an employer who violated the statute was guilty of a misdemeanor and "subject to the provisions of Section 4553." In addition, the employee was entitled to reinstatement and reimbursement for lost wages and benefits. (Stats. 1978, ch. 1250, § 3, p. 4065.) Section 4553, which is in division 4 of the Labor Code, provided the "amount of compensation otherwise recoverable shall be increased one-half," up to a maximum of $10,000, plus costs and expenses not to exceed $250. (Stats. 1972, ch. 1029, § 1, p. 1907.) Section 132a was amended in 1982 to delete the reference to section 4553 while incorporating its basic provisions. (Slats. 1982, ch. 922, § 1, p. 3363.) Section 4553 was amended at the same time to remove the $10,000 limit on the amount of increased compensation recoverable. (Stats. 1982, ch. 922, § 10, p. 3369.) Thus, since section 132a no longer referred to section 4553, it arguably lost its connection to division 4 of the Labor Code, as well as to section 11661 of the Insurance Code, which prohibits insurance against an employer's liability for the additional compensation imposed under section 4553.
[34] We note part IV refers to an "injury" rather than to a "bodily injury" and we will assume for purposes of this discussion, as the parties seem to do, that a discriminatory discharge in violation of section 132a is an "injury." It follows that a 132a violation, if it is to be covered by the policy, must be an injury "by accident" as opposed to an injury by disease.
[35] Insurance Code section 533 provides: "An insurer is not liable for a loss caused by the wilful act of the insured; but he is not exonerated by the negligence of the insured, or of the insured's agents or others."

Civil Code section 1668 states: "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law."
It is not clear that Civil Code section 1668 applies to indemnity agreements such as insurance policies. (See Smoketree-Lake Murray, Ltd. v. Mills Concrete Construction Co. (1991) 234 Cal.App.3d 1724, 1741, 286 Cal. Rptr. 435.) Nor would its effect be any different than that of Insurance Code section 533 if it were to apply. (Downey Venture v. LMI Ins. Co. (1998) 66 Cal.App.4th 478, 486, fn. 1, 78 Cal.Rptr.2d 142.) In any case, as discussed below, neither Civil Code section 1668 nor Insurance Code section 533 applies to workers' compensation insurance policies. (Azevedo v. Abel (1968) 264 Cal.App.2d 451, 458, 70 Cal.Rptr. 710.)
[36] Section 4553 normally provides an employee's exclusive remedy when a work-related injury is caused by the employer's intentional or reckless misconduct.

"... Cole and Johns Manville [Johns Manville Products Corp. v. Superior Court (1980) 27 Cal.3d 465, 165 Cal.Rptr. 858, 612 P.2d 948] contemplated a tripartite system for classifying injuries arising in the course of employment. First, there are injuries caused by employer negligence or without employer fault that are compensated at the normal rate under the workers' compensation system. Second, there are injuries caused by ordinary employer conduct that intentionally, knowingly or recklessly harms an employee, for which the employee may be entitled to extra compensation under section 4553. Third, there are certain types of intentional employer conduct which bring the employer beyond the boundaries of the compensation bargain, for which a civil action may be brought." (Fermino v. Fedco, Inc., supra, 7 Cal.4th at pp. 713-714, 30 Cal.Rptr.2d 18, 872 P.2d 559.)
[37] This conclusion may not be entirely accurate because section 4553 appears to apply to a wider range of nonaccidental conduct than do sections 533 of the Insurance Code and 1668 of the Civil Code. The "legislative ambiguity" regarding the place of intentional torts in the workers' compensation system "is compounded by case law construing section 4553, which suggests that the concept of `serious and willful misconduct' is not completely congruent with that of intentional common law tort. Rather, `serious and willful misconduct' has been viewed, as one court expressed it, as an intermediate form of wrongdoing falling somewhere `between ordinary negligence and an intentional act.'" (Fermino v. Fedco, Inc., supra, 7 Cal.4th at p. 710, 30 Cal.Rptr.2d 18, 872 P.2d 559, quoting Magliulo v. Superior Court (1975) 47 Cal.App.3d 760, 779, 121 Cal.Rptr. 621.)
[38] Industrial argues in its supplemental briefing that coverage under its policy for intentional workplace injuries is not an issue in this case because there is no allegation, much less any evidence, that Martin's fall from the ladder was anything other than an accident. This argument misses the point. The question here is whether part IV of the insuring agreements is ambiguous with regard to coverage for an employer's 132a liability because it purports to exclude many nonaccidental medical injuries that actually are covered, and it does not clearly distinguish between the employer's liability for these covered injuries and its liability under section 132a.
[39] Industrial's assertion Insurance Code section 533 has been applied to workers' compensation and employer's liability policies is misleadingly incomplete. It cites two cases which applied only the employer's liability portion, not the workers' compensation portion. (See B & E Convalescent Center v. State Compensation Ins. Fund, supra, 8 Cal.App.4th at p. 92, 9 Cal.Rptr.2d 894 and Transport Indemnity Co. v. Aerojet General Corp. (1988) 202 Cal.App.3d 1184, 1186, 249 Cal.Rptr. 463.)
[40] As noted, it was the 1982 amendment to section 132a that first gave rise to the "potential coverage dispute" in this case.
[41] The endorsement states:

"This policy does not apply to liability for additional compensation imposed on the insured under Sections 4553 and 4557, Division IV, Labor Code of the State of California, by reason of the serious and wilful misconduct of the insured or any representative of the insured or by reason of injury to an employee under sixteen years of age and illegally employed at the time of the injury."
Notably, Insurance Code section 11661 prohibits insurance only against an employer's liability for the additional compensation due under section 4553, not against its liability for the injuries caused by the employer's serious and willful misconduct.
[42] Melton observes that Industrial, in the year after his policy expired, substantially revised its standard form policy to add, among other things, a provision expressly making the insured responsible for payments due as the result of discrimination in violation of the workers' compensation law. He cites this "drafting history" as an acknowledgement by Industrial that its previous policy (with Melton) covered an employer's 132a liability, or at least that the earlier policy was ambiguous in this respect. While the drafting history of a standard form policy may be of assistance in deciding coverage issues (Montrose Chemical Corp. v. Admiral Ins. Co. (1995) 10 Cal.4th 645, 670-671, 42 Cal.Rptr.2d 324, 913 P.2d 878), subsequent policy revisions are not probative of the parties' mutual intention at the time the policy was made. (See McKee v. State Farm Fire & Cos. Co., (1983) 145 Cal. App.3d 772, 777-778, 193 Cal.Rptr. 745.)
[43] The sample 132a letter stated:

"Your policy of insurance with this company, under insuring agreements, reads:
"`IV. Application of Policy
"`This policy applies only to injury (1) by accident, or (2) by disease.'
"Thus, we do not provide insurance coverage under your policy for events which do not result in bodily injury...."
However, part IV plainly does not limit coverage to bodily injury.
Moreover, as discussed above, then-existing case law held Insurance Code section 533 did not apply to workers' compensation insurance. (Azevedo v. Abel, supra, 264 Cal.App.2d at p. 458, 70 Cal.Rptr. 710; see also Shell Oil Co. v. Winterthur Swiss Ins. Co., supra, 12 Cal.App.4th at p. 741, 15 Cal.Rptr.2d 815 [restating Azevedo's conclusion].) Thus, Industrial's internal coverage position rested on a tenuous legal foundation.
[44] Not every conflict of interest requires an insurer to provide independent counsel for its insured. (Golden Eagle Ins. Co. v. Foremost Ins. Co. (1993) 20 Cal.App.4th 1372, 1394, 25 Cal.Rptr.2d 242.) The mere fact that the insurer disputes coverage, for example, does not entitle the insured to Cumis counsel. (Ibid.) However, independent counsel is necessary in the "paradigm case" where resolution of the coverage issue turns on the insured's conduct, and the same conduct is at issue in the underlying third party lawsuit. (Id. at p. 1395, 25 Cal.Rptr.2d 242; San Diego Federal Credit Union v. Cumis Ins. Society, Inc., supra, 162 Cal.App.3d at pp. 364-365, 208 Cal.Rptr. 494; Civ.Code, § 2860, subd. (b).) In other words, a Cumis situation arises when common counsel's handling of the liability issue can affect the outcome of the disputed coverage issue. (Blanchard v. State Farm Fire & Casualty Co. (1991) 2 Cal. App.4th 345, 350, 2 Cal.Rptr.2d 884.) Thus, if Yrulegui believed the possibility of coverage required Industrial to furnish independent counsel, it follows Mitchell should have been hired to defend Melton with regard to whether or not he violated section 132a in the first place. The same would be true if Yrulegui were concerned, as he said, about the appearance of a conflict based on his close association with Industrial. In fact, however, Mitchell was retained as to coverage only and Yrulegui continued to represent Melton on the matter of his 132a liability.

The need for independent counsel also supposes the insurer has an interest in the proceeding inasmuch as it may be required to pay an eventual judgment against its insured. Thus, Industrial's acknowledgement of a Cumis situation was inconsistent with its position that it had no stake in and was not a party to the 132a hearing, and added to the confusion about who Yrulegui was representing from that point forward. Normally, had this truly been a Cumis situation, Industrial typically would have been represented by Yrulegui (or someone else), and Melton by Cumis counsel. In actuality, this probably was not a Cumis situation because resolution of the coverage issue turned not on any factual question but on two legal ones: the meaning of language in part IV of the policy, and the application of Insurance Code section 533. The two factual issues at the 132a hearing whether Martin suffered an industrial injury and whether Melton fired Martin for that reasonwent to Melton's liability rather than to coverage.
In this regard, the court instructed:
"A party is only entitled to independent or so-called `Cumis' counsel if the insurer has reserved its rights on a given coverage issue (rather than having denied coverage) and counsel retained by the insurer could, through the handling of the litigation against the insured, possibly affect the outcome of that coverage issue."
[45] An attempt by an insurer to settle a claim against its insured, like the establishment of a reserve fund, is some indication the insured believes it had a duty to defend against the claim. Miller v. Elite Ins. Co., supra, 100 Cal.App.3d 739, 753, 161 Cal.Rptr. 322.)
[46] For these same reasons, we disagree with the trial court's estoppel ruling in connection with Industrial's other coverage defenses (the accident limitation and the public policy statutes). Assuming Industrial (Souza and Yrulegui) told Melton when the 132a claim was first filed that he would be responsible for any award, this admonition ceased to have any meaning once the "potential coverage dispute" arose. Since coverage existed apart from the doctrines of estoppel and waiver, we need not examine the court's rulings on those issues any further,
[] See footnote *, ante.